RANGEN, INC., a corporation, Buhl Feed & Ice Company, a corporation, and Elwood D. Grimes, Appellants,

v.

STERLING NELSON & SONS, Inc., a corporation, Appellee.

No. 19740.

United States Court of Appeals
Ninth Circuit.

Oct. 18, 1965.

Rehearing Denied Nov. 23, 1965.

Peter W. Billings, G. Kenneth Handley, Jr., Salt Lake City, Utah, John C. Hepworth, Hepworth & Nungester, Buhl, Idaho, for appellants.

Marvin J. Bertoch, L. Ridd Larson, Ray, Quinney, & Nebeker, Salt Lake City, Utah, Douglas D. Kramer, Lloyd J. Walker, Kramer, Walker, Pope & Plankey, Twin Falls, Idaho, for appellee.

Before HAMLEY, HAMLIN and BROWNING, Circuit Judges.

HAMLEY, Circuit Judge:

A manufacturer of fish food, asserting that a competitor bribed an official of the State of Idaho to prefer the competitor's products, brought this action for damages and an injunction. The plaintiff is Sterling Nelson & Sons, Inc. (Nelson), a Utah corporation licensed to do business in Idaho and other states. The defendants are the competitor, Rangen, Inc. (Rangen), an Idaho corporation, Buhl Feed & Ice Company, a trade name under which Rangen does business, and Elwood D. Grimes, the state official.

In its complaint plaintiff undertakes to state four claims against defendants. The first is based upon section 2(c) of the Clayton Act, as amended by the Robinson-Patman Act, 49 Stat. 1527 (1936), 15 U.S.C. § 13(c) (1964). The

second and third claims are based, respectively, upon sections 1 and 2 of the Sherman Act, 26 Stat. 209 (1890), as amended 15 U.S.C. §§ 1 and 2 (1964). As to these three claims, district court jurisdiction is predicated upon 28 U.S.C. § 1331 (1964)—federal question. Plaintiff's fourth claim is based upon Idaho Code, § 48–202(c) (1948), which is virtually a counterpart of section 2(c) of the Clayton Act. As to this claim, plaintiff invokes diversity jurisdiction. 28 U.S.C. § 1332 (1964).

The four claims are in the alternative and under each plaintiff seeks treble damages and injunctive relief. Defendants jointly answered, denying essential allegations of the complaint and raising several other defenses. After a trial the district court, sitting without a jury, entered judgment for Nelson and against all of the defendants awarding actual damages of $18,900, trebled to $56,700, plus attorneys' fees in the amount of $7,500. No injunction was issued. Sterling Nelson & Sons, Inc. v. Rangen, Inc., D.Idaho, 235 F.Supp. 393.

The conclusions of law and accompanying opinion of the trial court indicate that the damages were awarded on the first claim, involving section 2(c) of the Clayton Act. The trial court rejected the second and third claims, based on sections 1 and 2 of the Sherman Act. The court further ruled that it was inappropriate and unnecessary to consider the fourth claim, based on the Idaho counterpart of section 2(c) of the Clayton Act.

Defendants jointly appeal, challenging various findings of fact and conclusions of law. They also question the applicability of section 2(c) under the facts of this case, and argue, additionally, that certain testimony was irrelevant and prejudicial, and should not have been received in evidence.

During the four years immediately prior to July, 1962, eight companies, including Rangen and Nelson, were in competition with each other in the production and sale of fish food in the western states. At various times during the period, Nelson contacted James C. Simpson, Chief of Fisheries Management for Idaho's Department of Fish and Game (Department), in an effort to sell its product to the state. Simpson, however, refused to accept Nelson's offers, and the state did not purchase any fish food from that company during this period. With insignificant exceptions, Rangen was the sole supplier of fish food to the State of Idaho for consumption at fish hatcheries during these four years.

From December, 1955 to June, 1962, Rangen paid Grimes sums aggregating $24,047.80. During that time Grimes was superintendent of the state's fish hatchery at Hagerman, Idaho. He was the authority in the Department with respect to the safe utilization and nutritional value of fish foods and with respect to fish food formulae.

None of the payments which Rangen made to Grimes were disclosed to any other employee of the state prior to their discovery in February, 1962. The trial court found that these payments were made pursuant to an understanding between Rangen and Grimes that the latter would use his best efforts to obtain for Rangen the fish food business of the State of Idaho. The trial court further found that Grimes did influence the responsible officials of the state to purchase substantially all of its fish food requirements from Rangen.

The trial court also found that, during the four-year period prior to July, 1962, and as a direct and proximate consequence of the described conduct of Rangen and Grimes, Nelson was precluded from the opportunity to bid for the supply of the state's fish food requirements. The trial court found that, except for the described interference, Nelson would have made gross sales to the State of Idaho aggregating $126,000 during the period in question, and would have realized a net profit of fifteen per cent, or $18,900 thereon.

On this appeal defendants challenge the findings of fact regarding Rangen's purpose in making payments to Grimes. They point to testimony which indicates that Rangen's purpose was to compensate

Grimes for experimentally developing the fish food formula which Rangen produced and sold generally, and to finance further experiments and research by Grimes. Attention is called to the fact that both Grimes and Thorleif Rangen, secretary-treasurer of Rangen, expressly denied that Grimes was paid to influence other Idaho officials. Defendants note that Nelson and other dry fish food manufacturers did not come into the market with a complete trout diet until one or two years after Rangen began making payments to Grimes. The secrecy of the payments was explained by Grimes as due to his fear that state authorities would not approve his "moonlighting" activities in developing fish food formulae.

Had the trial court accepted defendants' explanation of the transaction, there would have been evidence to support that view. But the trial court was not required to accept Grimes' stated reason for the secrecy, especially in view of the obvious impropriety, and patent conflict of interest, inherent in any undisclosed payment arrangement between Rangen and Grimes. Moreover, under the evidence, the trial court was justified in finding that Grimes did very little in the way of research for Rangen during the period 1958 through 1962 which would have justified "royalties."

The trial court was also warranted in attaching significance to the fact that the payments to Grimes ended in 1962, the year Rangen ceased selling fish food to Idaho. Another suspicious circumstance was that Rangen made the payments to Grimes' wife, rather than to Grimes directly. Additionally, the evidence reveals that Rangen's agreement with Grimes was similar to the technique Rangen was using in Utah for the purpose of attempting to monopolize the sale of fish food to that state.

■ The finding of fact that Rangen's payments to Grimes were intended as commercial bribes is not clearly erroneous.

■ Defendants question the finding of fact that Grimes influenced Simpson

to purchase fish food from Rangen. Examination of the record convinces us that this finding is not clearly erroneous.

Defendants next contend that Nelson failed to meet the requirements of proof as to the amount of damages. In particular, defendants question the sufficiency of the evidence to support the findings that: (1) except for the payments by Rangen to Grimes, Nelson would have sold to Idaho approximately one fourth of its fish food requirements during the four-year period; (2) Nelson would have grossed $126,000 on these sales; and (3) Nelson would have made a net profit of approximately fifteen per cent, or $18,900 on the gross sales.

■ When the first bids were let by Idaho, following discontinuance of the exclusive arrangement with Rangen, there were four bidders. Nelson was the successful bidder on the first of such public offers in 1962. Whether Nelson would have been the low bidder on one fourth of the business during 1958 through 1962, assuming a climate of free competition, is not susceptible of tangible proof. But considering Nelson's position in the industry, and its success in bidding when public offers were invited in 1962, we think the trial court was justified in finding that Nelson would have obtained one fourth of the business.

Nelson would have grossed $126,000 on sales amounting to one fourth of Idaho's fish food requirements, if Nelson had made the sales at its list prices. Although these prices were below the prices for which Rangen obtained the business in the four-year period, Rangen's prices in the competitive market were well below Nelson's list prices. Moreover, there is no evidence that, for competitive bidding purposes, Nelson ever utilized its list prices.

In the light of past practice, however, the trial court was not required to find that Nelson could have obtained a share of Idaho's fish food business in the 1958 through 1962 period only by reducing its list prices. Having in view Rangen's preferred position with Idaho up to that

time, Nelson and other competitors might well have concluded, and correctly, that all they had to do to get a share of the business, was to underbid Rangen's pre-existing actual prices to Idaho.

The trial court's finding that Nelson would have made a net profit of fifteen percent is conservative when compared to estimates, presented by Nelson's witnesses, that the company made from 16.5% to 20% on this kind of business. Defendants assert that estimates of net profit will not do, and that actual accounting records supporting a claimed net profit percentage must be submitted. We do not agree. See Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 66 S. Ct. 574, 90 L.Ed. 652; Richfield Oil Corporation v. Karseal Corporation, 9 Cir., 271 F.2d 709.

Defendants next question the applicability, under the facts of this case, of section 2(c) of the Clayton Act, relied upon by the trial court in entering judgment for plaintiff Nelson.[1] Defendants present two lines of argument under this heading. The first of these is that section 2(c) does not apply to the case at bar because that statute is directed solely against price discrimination through rebates disguised as brokerage, not against commercial bribery unassociated with price discrimination.

Subsection (c) of section 2, with which we are here concerned, does not expressly relate solely to price discrimination, and defendants do not so contend. They argue, however, that read in the light of its statutory context and legislative history, and as interpreted by most courts, such a limitation must be read into section 2(c).

We find nothing in the statutory context of section 2, which requires that subsection (c) be limited to instances of price discrimination.

With regard to the legislative history, defendants cite excerpts which amply demonstrate that, in enacting section 2(c), the prime concern of Congress was to curtail price discriminations accomplished by pseudo-brokerage arrangements. The Supreme Court, in Federal Trade Comm'n v. Henry Broch & Co., 363 U.S. 166, 169, 80 S.Ct. 1158, 4 L.Ed.2d 1124, noted this principal legislative concern. But, in a footnote (page 169), the Court also expressed the view that the legislative history demonstrates a Congressional intent to proscribe other practices such as the bribing of a seller's broker by the buyer.[2]

This view is further borne out by the statement in the House Report, quoted below, indicating that Congress was concerned with preserving the fiduciary relationship between a broker and his client.[3] We are not aware of any legislative history in which the application of section 2(c) to cases of commercial brib-

---

1. Section 2(c) reads:
 "(c) Payment or acceptance of commission, brokerage or other compensation.
 "It shall be unlawful for any person engaged in commerce, in the course of such commerce, to pay or grant, or to receive or accept, anything of value as a commission, brokerage, or other compensation, or any allowance or discount in lieu thereof, except for services rendered in connection with the sale or purchase of goods, wares, or merchandise, either to the other party to such transaction or to an agent, representative, or other intermediary therein where such intermediary is acting in fact for or in behalf, or is subject to the direct or indirect control of any party to such transaction other than the person by whom such compensation is so granted or paid."

2. The Broch court referred to debates which appear at 80 Cong. Rec. 7759–7760, 8111, 8112.

3. H.R.Rep.No.2287, 74th Cong. 2d Sess. p. 14 (1936):
 "The relation of the broker to his client is a fiduciary one. To collect from a client for services rendered in the interest of a party adverse to him, is a violation of that relationship; and to protect those who deal in the streams of commerce against breaches of faith in its relations of trust, is to foster confidence in its processes and promote its wholesomeness and volume."

ery not involving price discrimination is expressly disclaimed.

In our view, the legislative history tends to confirm, rather than negate, a construction of section 2(c) which renders it applicable under the facts of this case.

Defendants rely upon the recent decision of the Supreme Court in United States v. Boston & M.R.R., 380 U.S. 157, 85 S.Ct. 868, 13 L.Ed.2d 728, as establishing that ordinary bribery is not a basis for recovery under the antitrust laws. That action was a prosecution against the railroad under section 10 of the Clayton Act, 38 Stat. 734 (1914), 15 U.S.C. § 20 (1964). The gist of the indictment was that three of the railroad officers had accepted bribes from the purchaser of some of the railroad's railway cars, as compensation for making the sale without competitive bidding. The Court, rejecting the Government's contention that the bribes and related agreements gave the officers a "substantial interest" in the purchasing company, in violation of the Act, said:

"But it is doubtful that this indictment; as illuminated by the bill of particulars, alleges anything more in substance than a bribe. Bribery might well be in the family of offenses covered under a conflict of interest statute. But it is more remote from an antitrust frame of reference." 380 U.S. at 162, 85 S. Ct. at 871.

We do not regard the quoted observation as a definitive ruling that under no set of circumstances could commercial bribery be violative of any antitrust law. In our case the bribery not only undermined a fiduciary relationship which Congress sought to protect, but gave one seller a grossly unfair advantage over a competing seller. Where commercial bribery is associated with evils which a particular provision of the antitrust laws was designed to prevent, the fact that it was bribery rather than a more defensible arrangement ought not to preclude application of the statute.

The view that price discrimination is not a necessary element of a section 2(c) violation has found support in the cases construing that section. In Federal Trade Comm'n v. Washington Fish & Oyster Co., 9 Cir., 271 F.2d 39, 44, this court said: "Subsections (c), (d), and (e) of section 2 of the Clayton Act, as amended, unqualifiedly make unlawful certain business practices other than price discriminations." In Southgate Brokerage Co. v. Federal Trade Comm'n, 4 Cir., 150 F.2d 607, it was argued that without proof of price discrimination among buyers, the receipt of brokerage did not violate section 2(c). This argument was rejected by the court on the ground that "price discrimination, which is covered by section 2(a) of the Act, 15 U.S.C.A. § 13(a), is not necessary to a violation of section 2(c), * * *." 150 F.2d at 609.

Section 2(a) deals expressly with the granting of discriminatory prices, while section 2(c) prohibits a particular trade practice deemed by Congress to be detrimental to competition. Section 2(c) is to be construed independently, without reference to the price discrimination section. Great Atlantic & Pacific Tea Co. v. Federal Trade Comm'n, 3 Cir., 106 F.2d 667, 675–677; Oliver Bros. v. Federal Trade Comm'n, 4 Cir., 102 F.2d 763, 767–768; Biddle Purchasing Co. v. Federal Trade Comm'n, 2 Cir., 96 F.2d 687, 690. A violation of section 2(a) is not necessarily a violation of section 2(c). Federal Trade Comm'n v. Henry Broch & Co., 363 U.S. 166, 170–171, 80 S.Ct. 1158, 4 L.Ed.2d 1124.

Similarly, section 2(b) which affords a defense to a showing of price discrimination has been held inapplicable where a violation of section 2(c) is charged. See Federal Trade Comm'n v. Washington Fish & Oyster Co., 9 Cir., 271 F.2d 39. The Supreme Court, in Federal Trade Comm'n v. Simplicity Pattern Co., 360 U.S. 55, 79 S.Ct. 1005, 3 L.Ed.2d 1079, holding the justification defenses of sec-

tion 2(b) inapplicable in a section 2(e) proceeding, stated:

"Subsections (c), (d), and (e), on the other hand, unqualifiedly make unlawful certain business practices other than price discriminations. * * * In terms, the proscriptions of these three subsections are absolute. Unlike § 2(a), none of them requires, as proof of a prima facie violation, a showing that the illicit practice has had an injurious or destructive effect on competition." 360 U.S. at 65, 79 S.Ct. at 1011.

A section 2(c) case came before the Supreme Court for the first time in Federal Trade Comm'n v. Henry Broch & Co., 363 U.S. 166, 80 S.Ct. 1158. The Court held that section 2(c) applies to a seller's broker who makes allowances to the buyer indirectly through reduced brokerage charges to the seller. The Court, however, limited this holding to instances of discrimination. "A price reduction based upon alleged savings in brokerage expenses is an 'allowance in lieu of brokerage' when given only to favored customers." 363 U.S. at 176, 80 S.Ct. at 1164.

There has been some speculation that the Broch case may have superimposed a requirement of price discrimination on section 2(c). Rowe, Price Discrimination Under the Robinson-Patman Act 344–45 (1962); Federal Trade Comm'n v. Henry Broch & Co., 363 U.S. 166, 189, 80 S.Ct. 1158 (dissenting opinion). However, discrimination was used in Broch to determine if the price arrangement was an "in lieu" of brokerage transaction; and, although discrimination would appear now to be relevant in reduced-commission cases, it does not follow that it is now an essential element in cases involving the outright payment of unearned brokerage.

In Fitch v. Kentucky-Tennessee Light & Power Co., 6 Cir., 136 F.2d 12, the plaintiff power company recovered damages under section 2(c) from its former president who had accepted bribes in connection with the power company's purchases of coal. The court there found that commercial bribery was within the intended proscription of section 2(c) despite the fact that the compensation was not passed on to the buyer. The court in Fitch reviewed the prior decisions which had construed section 2(c) as an absolute prohibition of brokerage payments except for services rendered, and concluded that the threat to competition posed by such bribery, brought it within the terms of section 2(c).

Defendants criticize the Fitch opinion, asserting that it wholly ignored the statute's context and historical basis. Enough is said above to indicate that we do not share this view. Defendants also state that, in Fitch, there was an element of price discrimination, since the plaintiff there was the buyer who presumably paid more because of the disloyalty of his employee, while here the plaintiff is a seller, who complains only that it was deprived of business. But while this factual distinction exists, the rationale of Fitch, as defendants acknowledge, is based upon a flat rejection of the contention that the Robinson-Patman Act is concerned only with price discrimination.

We conclude that section 2(c) is not directed solely against price discriminations through rebates described as brokerage. Given fulfillment of the express requirements of subsection 2(c), that subsection also encompasses cases of commercial bribery tending to undermine the fiduciary relationship between a buyer and its agent, representative, or other intermediary in a transaction involving the sale or purchase of goods, wares or merchandise.

Defendants also argue, with regard to the general applicability of section 2(c), that sales to a sovereign are excluded, and hence payments made to Grimes in connection with Rangen's sales to the State of Idaho are not covered by that subsection. Several district courts have apparently so ruled, on the theory that such an exemption is required by the

policy which allows the sovereign to buy at the best price obtainable.[4]

Assuming that there is such a policy and that it gives rise to such an exemption in an appropriate case, it has no room to operate here. Idaho was the victim, not the beneficiary, of the transactions here in question. It paid more than it should have, instead of less. Under the circumstances of this case, enforcement of section 2(c) will serve, rather than defeat, the asserted policy, by discouraging bribery of state officials.

Defendants' next line of argument in questioning the applicability of section 2(c) under the facts of this case, pertains to the express requirements of that subsection.

A payment or grant "* * * for services rendered in connection with the sale or purchase of goods, wares, or merchandise, * * *" is not forbidden by section 2(c).[5] Defendants assert that the payments made by Rangen to Grimes were "for services rendered," pointing to the finding of fact that the purpose of the payment was to influence Grimes' conduct as a state employee, in an effort to gain the fish food business for Rangen.

In the earlier cases construing section 2(c), services furnished by a buyer's agent to a seller were held not to be "services rendered" within the exception referred to above.[6] This emasculation of the services rendered exception has been criticized as unduly hindering legitimate brokerage.[7] The Supreme Court in Federal Trade Comm'n v. Henry Broch & Co., 363 U.S. 166, 173, 80 S.Ct. 1158, acknowledged this criticism of the construction of the "services rendered" exception; some of the language in that opinion indicates that the exception may find new life.[8] This court, in Federal Trade Comm'n v. Washington Fish & Oyster Co., 9 Cir., 282 F.2d 595, indicated that services of a promotional nature performed by the buyer for the seller could be within the exception while services which a buyer normally performs for himself would not be included.

Nevertheless, the "services rendered" exception must be read in the light of the Congressional purposes in enacting section 2(c), one of which was to guard against practices undermining the fiduciary relationship between buyers and sellers on the one hand, and their agents, representatives, or other intermediaries on the other, in a section 2(c) transaction. If "services rendered" were construed to include services performed by a buyer's agent for the seller but against the interest of the buyer, section 2(c) would not fulfill that Congressional purpose. We do not believe that this exception may be used as a statutory shield to protect illicit conduct which the sub-

4. See Sperry Rand Corp. v. Nassau Research & Development Associates, Inc., 152 F.Supp. 91, 96 (E.D.N.Y.1957); Sachs v. Brown-Forman Distillers Corp., 134 F. Supp. 9, 16 (S.D.N.Y.1955), aff'd per curiam 234 F.2d 959 (2nd Cir. 1956); General Shale Products Corp. v. Struck Construction Co., 37 F.Supp. 598, 602–603 (W.D.Ky.1941), aff'd on other grounds 132 F.2d 425 (6th Cir. 1942).

5. Section 2(c) is quoted in note 1.

6. Great Atlantic & Pacific Tea Co. v. Federal Trade Comm'n, 3 Cir., 106 F.2d 667, 674–675; see, also, Modern Marketing Service v. Federal Trade Comm'n, 7 Cir., 149 F.2d 970, 978; Quality Bakers v. Federal Trade Comm'n, 1 Cir., 114 F.2d 393, 398; Oliver Bros. Inc. v. Federal Trade Comm'n, 4 Cir., 102 F.2d 763, 770;

Biddle Purchasing Co. v. Federal Trade Comm'n, 2 Cir., 96 F.2d 687, 691.

7. Report of the Attorney General's National Committee to Study the Antitrust Laws 192 (1955); Oppenheim, Federal Antitrust Legislation: Guideposts to a Revised National Antitrust Policy, 50 Mich.L.Rev. 1139, 1207 n. 178 (1952); Rowe, Price Discrimination, Competition, and Confusion: Another Look at Robinson-Patman, 60 Yale L.J. 929, 957–58 (1951).

8. In Broch, at page 173, 80 S.Ct. at page 1163, the Supreme Court said:
 "There is no evidence that the buyer rendered any services to the seller * * *. We would have quite a different case if there were such evidence and we need not explore the applicability of § 2(c) to such circumstances."

section as a whole was designed to suppress.

■ We conclude that the "services rendered" exception to section 2(c) is not applicable under the facts of this case.

Payments which otherwise meet the requirements of section 2(c) are not unlawful unless made by " * * * any person engaged in commerce, in the course of such commerce * * *." Construing somewhat similar language contained in section 2(a) of the Clayton Act, the Supreme Court has held that in order for sales to come under that subsection, " * * * they must have been made in interstate commerce." Standard Oil Co. v. Federal Trade Comm'n, 340 U.S. 231, 236–237, 71 S.Ct. 240, 243, 95 L.Ed. 239.[9] Defendants argue that, under the facts of this case, it must be held that the payments to Grimes by Rangen were not made in the course of interstate commerce.

The pertinent facts may be briefly stated. Rangen and Nelson were engaged in the sale of fish food in several states. However, Rangen prepared its formula for fish supplement sold to the State of Idaho entirely in Buhl and Hagerman, Idaho. To this it added the other components of whey, yeast and fish meal, and pelletized the mix, all at its plant in Buhl. Upon arrival in Buhl, the additives which originated out of state were stored in bulk and were finally transformed into ingredients of an entirely new product.

Some of the finished product was then delivered to the state hatchery at Hagerman, Idaho, a distance of approximately fifteen miles. The rest was stored at Buhl, Idaho for pick-up by the state for delivery to other state hatcheries. No sale to the state crossed state lines. The feed was consumed at hatcheries entirely within the State of Idaho, and Rangen was paid by check from the state capital at Boise.

■ The Supreme Court has adopted the "flow of commerce" concept with regard to Robinson-Patman violations. Thus temporary storage of an interstate product, or an interruption in its transport, does not deprive it of its interstate character. Standard Oil Co. v. Federal Trade Comm'n, 340 U.S. 231, 238, 81 S. Ct. 240. But this concept is inapplicable here because the ingredients which Rangen brought into Idaho from other states not only came to rest in Idaho but were there transformed into an entirely new product.

Borden Company v. Federal Trade Comm'n, 7 Cir., 339 F.2d 953, and Willard Dairy Corp. v. National Dairy Products Corp., 6 Cir., 309 F.2d 943, involving section 2(a) of the Clayton Act, tend to support the view that transactions of the character involved in our case are not "in the course" of interstate commerce. Fitch v. Kentucky-Tennessee Light & Power Co., 6 Cir., 136 F.2d 12, in which the plaintiff in a section 2(c) action prevailed, is distinguishable, because there the critical transactions consisted of the sale of coal across state lines.

However, plaintiff and the trial court rely upon Moore v. Mead's Fine Bread Co., 348 U.S. 115, 75 S.Ct. 148, 99 L.Ed. 145, as requiring a holding that Rangen's payments to Grimes were in the course of interstate commerce. This was a price discrimination case under section 2(a). The plaintiff operated a bakery in New Mexico, conducting an intrastate business; defendant also operated a bakery in New Mexico, selling bread in that state and also in Texas. Defendant was linked by corporate ownership with several other bakeries operating in New Mexico and Texas. Defendant cut his prices in New Mexico but not in Texas and was sued for violating section 2(a) and injuring plaintiff's business. Despite the contention that this was purely local—affecting a local competitor not doing interstate business—the Supreme

9. We say "somewhat similar language" because section 2(a) contains a third reference to interstate commerce, not contained in section 2(c). See Borden Company v. Federal Trade Comm'n, 7 Cir., 339 F.2d 953, 955.

Court held the Robinson-Patman Act applicable.

The following quotation summarizes the Court's reasoning:

"We think that the practices in the present case are also included within the scope of the antitrust laws. We have here an interstate industry increasing its domain through outlawed competitive practices. The victim, to be sure, is only a local merchant; and no interstate transactions are used to destroy him. But the beneficiary is an interstate business; the treasury used to finance the warfare is drawn from interstate, as well as local, sources * * *." 348 U.S. at 119, 75 S.Ct. at 150.[10]

Granted that the facts of Moore vary from those of our case, it seems to us that its rationale is nevertheless applicable. In Moore, defendant was able to reduce local prices because of the financial resources provided by its interstate business. In our case, Rangen was better able to compete in his interstate business because he was receiving an unfair preference in his local Idaho business.

 Within the rationale of Moore, the payments to Grimes were made in the course of interstate commerce because they created influences intrastate which injured the free competitive interstate commerce in fish food outside Idaho. The concept to which we refer is something more than the broader test of "affecting interstate commerce," which is applied under the Sherman Act. Critical here is the fact that Rangen's payments to Grimes gave it a definite advantage in its own interstate dealings—the "beneficiary" was its interstate business—and therefore the payments must be regarded as having been made in the course of its own interstate commerce.

It is necessary to the application of section 2(c) that the transaction between Rangen and the State of Idaho constitute a sale of "goods, wares, or merchandise," and not merely a contract for services. The trial court found that the transaction constituted such a sale.[11] Defendants, however, argue that it was a contract for services.

 It is true that the State of Idaho supplied some of the ingredients. Rangen, however, supplied the whey, yeast and fish supplement. The latter ingredient made up at least fifty per cent of the mix, and possibly as much as sixty-three per cent. Defendants concede that Rangen did not bill the state separately for its mixing service, but argue that this service charge was nonetheless included in the prices quoted. At the trial defendants' accounts receivable ledger was introduced; this showed a listing of ingredients sold to the state with no separate charge, or separate billing at least, for services.

In connection with the "commerce issue," defendants contended that the ingredients had been converted into an entirely new product, the fish food. Similarly the ingredients furnished by the

---

10. The Court also quoted remarks of Congressman Utterback, manager of the bill in the House:

" 'Where, however, a manufacturer sells to customers both within the State and beyond the State, he may not favor either to the disadvantage of the other; he may not use the privilege of interstate commerce to the injury of his local trade, nor may he favor his local trade to the injury of his interstate trade. The Federal power to regulate interstate commerce is the power both to limit its employment to the injury of business within the State, and to protect interstate commerce itself from injury by influences within the State.' " 348 U.S. at 120, 75 S.Ct. at 151.

11. The trial court in its finding of fact number 5 stated:

"Realistically, the transactions between Rangen, Inc. and the State of Idaho were sales of processed fish food and not contracts for services. The proportion supplied by the State of the ingredients of the final product delivered was relatively insignificant, and this was done for the purpose of circumventing the State Purchasing Agent and of attempting to give to a purchase transaction the appearance of a contract for services."

state could be said to have lost their identity, the sale being for the finished fish food. The formula for the fish food was a secret, and only the food made from Rangen's formula was being sold.

Under the facts reviewed above, we believe that the trial court correctly characterized this transaction as a sale of fish food, and not a contract for services.

A payment is not covered by section 2 (c) of the Clayton Act unless the payment was made either: (1) to the other party to the transaction, or (2) "* * * to an agent, representative, or other intermediary therein where such intermediary is acting in fact for or in behalf, or is subject to the direct or indirect control, of any party to such transaction other than the person by whom such compensation is so granted or paid."

Defendants argue that this requirement of section 2(c) was not fulfilled because as the trial court found, payments received from Rangen were computed as a percentage of gross sales of fish food made by Rangen, Inc. to customers other than the State of Idaho. According to this finding, defendants urge, Grimes was paid for services he rendered to Rangen in entirely unrelated sales to third parties.

We have determined that the trial court's finding of fact that a principal purpose of Rangen in making payments to Grimes was to cause the latter to influence Idaho state officials to purchase substantially all its requirements of fish food from Rangen, is not clearly erroneous. This purpose being established, the fact that the payments were roughly computed on a basis related to Rangen's other sales is of no consequence, being indicative only of subterfuge.

In order to find a violation of section 2(c), the payments involved must be made to a party to the transaction or to someone connected with that party in an agency, representative, or intermediary relationship. Reference must be made to the transactions in question to determine whether or not the necessary relationship exists. In this case,

Grimes was an employee of the State of Idaho, and, although not officially related to the state's purchasing policies, he did influence the decisions concerning the purchase of fish food. Grimes was instrumental in bringing about and maintaining the exclusive sales arrangement between the State of Idaho and Rangen; and he can therefore be regarded as an "intermediary" within the meaning of section 2(c).

In our view it is wholly immaterial that Grimes was not acting as an "agent" or "representative" in the customary sense, since his status as an "other intermediary" is established. As an employee of the state and its fish nutrition expert, Grimes was at all times subject to the control of his employer as required by section 2(c); and, it is not significant that in these particular transactions he was not serving the best interests of his employer, the State of Idaho.

The legislative history referred to above, indicating that section 2(c) was intended to reach instances of commercial bribery, makes clear that the section is not limited to cases in which the intermediary acts in good faith. Likewise, and for the same reason, we conclude that the person receiving the payments need not turn them over to his principal, in order for such payments to be made to an agent, representative, or other intermediary, within the meaning of that section.

There remains a question as to the admissibility of evidence. The trial court received in evidence, over the objection of defendants, testimony to the effect that, beginning in April, 1956, Rangen employed one Junius Powell, a fish hatchery superintendent for the State of Utah. This testimony was produced to support an inference that Rangen was following the same practice in Idaho that he had followed in Utah.

The purpose of Rangen's payments to Grimes was in issue. The evidence that Rangen's similar practices, employed in an adjoining state, were designed to influence state action is rele-

vant as tending to show the purpose of the payments in Idaho. While defendants believe the Utah evidence is indecisive, this was for the trial court to decide. The court has more latitude in matters of this kind where, as here, the case is tried to the court without a jury, for there is less likelihood of prejudice disproportionate to the probative value of the evidence. The court did not err in receiving this evidence.

Plaintiff requests an allowance of attorneys' fees on appeal. Defendants make no response to the request. Such fees are allowable in a case of this kind. Twentieth Century Fox Film Corporation v. Goldwyn, 9 Cir., 328 F.2d 190. Plaintiff is allowed an attorney's fee on appeal in the amount of $2,000.00.

Affirmed.