**MUNICIPALITY OF ANCHORAGE, a Municipal Corporation, and Anchorage Telephone Utility, A Public Agency and Instrumentality of the Municipality of Anchorage, Plaintiffs,**

v.

**HITACHI CABLE, LTD., Hitachi Ltd. of Japan, Richard L. McBride, Forrest Ellis, Naoto Kudo, Hajime Noda, Takao Shiomi and Yoshitoki Kato, Defendants and Third Party Plaintiffs,**

v.

**MARUBENI CORPORATION, a Japanese corporation, and Marubeni America Corporation, a New York corporation, Third Party Defendants.**

No. A 81–347 Civ.

United States District Court, D. Alaska.

Sept. 16, 1982.

---

Ronald G. Birch of Birch, Horton, Bittner, Monroe, Pestinger & Anderson, Anchorage, Alaska, for plaintiffs.

Paul L. Davis of Boyko & Davis, Anchorage, Alaska, William McD. Miller, A. Raymond Hamrick, III and Karl K. Ransom of Musick, Peeler & Garrett, Los Angeles, Cal., for defendants.

## OPINION AND ORDER

FITZGERALD, District Judge.

The Municipality of Anchorage and its telephone utility have made a claim in this action for damages arising out of Hitachi Cable, Ltd.'s bribery of two municipal employees, Richard McBride and Forrest Ellis.[1] The Municipality seeks the remedies available for violations of the Sherman Act, 15 U.S.C. §§ 1, 2, the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962, the Robinson-Patman Act, 15 U.S.C. § 13(c), and pleads additionally several pendent state law causes of action.[2] At issue now are motions by Hitachi Cable to dismiss the Robinson-Patman Act claim for lack of standing and by the Municipality for summary judgment on its claims under RICO, the Sherman Act, and the Robinson-Patman Act.

The Anchorage Telephone Utility is the municipal department that constructs, maintains, and operates the Anchorage telephone system. Between 1970 and 1978, the Utility, following competitive bidding, awarded two year contracts for supplying telephone cable. The bid requests typically covered approximately 125 different types of cable and required prospective bidders to list their price per thousand feet of each item. The Utility evaluated the bids by multiplying bid prices by a factor, known as an evaluation quantity, representing the Utility's anticipated need for each type of cable. The resulting product was said to be the extended price. A total package price was derived by summing up the extended prices of all cable types, and the contract would ordinarily be awarded to the bidder offering the lowest package price. Bidders were required to conform to the several specifications contained in the bid invitation, however, and bids failing to meet specifications could be rejected.

The Utility's bid solicitation did not obligate the Utility to purchase a fixed amount of any particular cable and many types were not likely to be needed by the Utility during the contract period. Bids were requested on these "non-buy" items only to guard against the possibility that some quantities of that type might be needed. Under this system a bidder with inside information could generate a low package price while bidding high on types of cable likely to be ordered. In short, the structure of the Utility's bidding system lent itself admirably to price rigging.

Hitachi Cable, Ltd. is a Japanese corporation engaged in the manufacture and sale

---

1. The Municipality's claims are against Hitachi Cable, McBride, Ellis, and four Hitachi employees, Naoto Kudo, Hajime Noda, Takao Shiomi, and Yoshitoki Kato.

 Hitachi Cable has filed counterclaims against the Municipality, cross-claims against McBride and Ellis, and third party claims against Marubeni Corporation and Marubeni America Corporation. None of Hitachi's counter-, cross-, or third party claims are at issue here.

2. These additional claims are for inducement to breach a fiduciary duty, breach of fiduciary duty, intentional misrepresentation, negligent misrepresentation, misappropriation of confidential information, intentional interference with prospective advantage, bad faith breach of contract, commercial bribery, and violation of the Alaska antitrust laws, A.S. 45.50.562, .564.

of industrial cables. During the period of time covered by this action Hitachi Cable manufactured telephone cables which it sold to Marubeni Corporation. In turn, Marubeni resold the cable to an American corporation, Marubeni of America, which sold to the Municipality.

Responsibility for administering the Utility's bidding procedures, for approving the bids, and for supervising contract performance rested with the Assistant Manager for Outside Plant Engineering and Construction. In particular, the Assistant Manager was responsible for compiling lists of evaluation quantities and non-buy items, determining which bids met Utility specifications, and making the final recommendation on the bid to be accepted. Between 1968 and 1978 Richard McBride was Assistant Manager of Outside Plant Engineering and Construction. His predecessor in the position was Forrest Ellis.

The Municipality suggests that between 1970 and 1978 Hitachi, in conspiracy with the two Marubeni corporations, paid bribes of approximately $250,000 to Ellis and McBride for information concerning evaluation quantities and non-buy items and for their assistance in obtaining cable contracts with the Utility. Hitachi did not directly pay its share of bribes. Instead Hitachi factored into its price to Marubeni a sum representing the bribe for cable. Marubeni, in turn, paid Ellis a "commission" which Ellis then split with McBride. In concept the scheme was simple and straightforward and well suited to accomplish its purpose of corruption. I turn to the claims.

A. *The Robinson-Patman Act*

1. *Standing*

 Section 2(c) of the Robinson-Patman Act makes it unlawful for any person en-gaged in commerce to accept compensation for services not rendered in connection with the sale or purchase of goods. 15 U.S.C. § 13(c).[3] While enacted primarily to curb price discriminations disguised as brokerage arrangements, section 2(c) has been interpreted to encompass commercial bribery "tending to undermine the fiduciary relationship between a buyer and its agent . . . in a transaction involving the sale or purchase of goods." *Rangen, Inc. v. Sterling Nelson & Sons,* 351 F.2d 851, 858 (9th Cir. 1965), *cert. denied* 383 U.S. 936, 86 S.Ct. 1067, 15 L.Ed.2d 853 (1966). The fact that the Municipality has chosen to call the payments to Ellis commercial bribes rather than unlawful commissions or brokerage fees thus has little significance. The substance of the transaction controls.

Hitachi's principal objection to the section 2(c) claim is that the Municipality lacks standing to sue. Hitachi suggests that when a seller bribes a buyer's agent, only competitors of the seller suffer competitive injury and have standing to sue. Furthermore, since the Utility is a regulated monopoly and has no competitors, it cannot suffer a competitive injury.

The authorities relied upon by Hitachi begin with *Computer Statistics, Inc. v. Blair,* 418 F.Supp. 1339 (S.D.Tex.1976). The principal business of Computer Statistics, Inc. was performing data processing services for others on machines which it leased or bought. As an extension of its data processing business, Computer Statistics regularly bought, sold and leased out equipment ancillary to computer operation. On occasion the company also bought computers and leased them to others, although it was not in the business of doing so.

Blair was chairman of the board of Computer Statistics. He and Davis, Computer

---

**3.** The section provides in full:

It shall be unlawful for any person engaged in commerce, in the course of such commerce, to pay or grant, or to receive or accept, anything of value as a commission, brokerage, or other compensation, or any allowance or discount in lieu thereof, except for services rendered in connection with the sale or purchase of goods, wares, or merchandise, either to the other party to such transaction or to an agent, representative, or other intermediary therein where such intermediary is acting in fact for or in behalf, or is subject to the direct or indirect control, of any party to such transaction other than the person by whom such compensation is so granted or paid.

Statistics' president, paid substantial bribes to employees of computer and data processing equipment firms to obtain business opportunities for their own benefit. Following a change of management, Computer Statistics learned of the dealings and brought an action to recover on various theories including section 2(c).

The district court held that section 2(c) applies not only to cases of price discrimination but also includes commercial bribery cases not involving price discrimination. *Id.* at 1347; *See also Calnetics Corp. v. Volkswagen of America, Inc.,* 532 F.2d 674, 696 (9th Cir. 1976); *Rangen,* 351 F.2d at 858. While acknowledging there were many cases holding proof of an adverse effect on competition may be unnecessary for establishing liability under section 2(c), the court nevertheless concluded that "... some anticipated effect is necessary and ... a plaintiff who cannot show competitive injury lacks standing to complain about payments although they literally fall within the language of the statute." 418 F.Supp. at 1347. Since Computer Statistics was not in the business of selling or leasing computers, it was not a competitor and claims relating to computer sales and purchases were dismissed.

The Fifth Circuit in *Larry R. George Sales Co. v. Cool Attic Corporation,* 587 F.2d 266 (5th Cir. 1979), adopted the rule of *Computer Statistics* that only competitors have standing to sue for a violation of the Robinson-Patman Act. The defendants in *George Sales* were in the business of manufacturing and distributing motorized attic fans. George Sales alleged an oral contract with the defendants requiring payment of a 4% commission on all sales of motorized fans made by defendants to the S. S. Kresge Company. According to the claim, Cool Attic conspired with Kresge's agent to divert commissions from George Sales to the agent's son, an employee of George Sales. The commissions were alleged to be commercial bribes since the agent threatened to withhold purchases by Kresge if the commissions were not continued.

The Fifth Circuit agreed that the district court's dismissal of the section 2(c) claim was correct and adopted the trial court's memorandum and order as its own. The issue turned on the standing requirements of 15 U.S.C. § 15. It was held that only plaintiffs who fall within the target area of an antitrust violation have standing to sue for damages. Anyone not "within that section of the economy which is endangered by a breakdown of competitive conditions in a particular industry" is barred from recovery.[4] Since the court found the anti-competitive conduct of the defendants to affect only the attic fan and ventilator industry, George Sales, which was not in that industry, was without standing to sue. The opinion concluded "only if plaintiff was in the same business and in competition with S. S. Kresge Company or the defendants would he have standing under 15 U.S.C. § 15." *Id.* at 272.

The most recent and perhaps the most restrictive interpretation requiring competitive injury for section 2(c) standing is contained in *Bunker Ramo Corporation v. Cywan,* 511 F.Supp. 531 (N.D.Ill.1981). That case holds that absence of competitive injury is fatal to an antitrust claim based on commercial bribery, and only competitors of the company paying the bribes can suffer competitive injury.

As envisioned by Congress and interpreted by the courts, section 2(c) is designed to protect and promote competition among businesses competing at the same functional level in the marketing chain. Such competition should be based upon the price and quality of the goods rather than upon the ability of a buyer or seller to extract or pay, as the case may be, a commission or other compensation to one party or his agent in exchange for favorable treatment. Thus, while a company may be injured when a supplier bribes an employee of that company in order to make a sale, the purchaser's injury is not cognizable under the antitrust laws since it is not a "competitive injury" within the meaning of the statutory

---

4. *Cf., Karseal v. Richfield Oil Corp.,* 221 F.2d 358, 362 (9th Cir. 1955).

framework. Rather, it is the supplier's competitors who have suffered competitive injury as a consequence of the bribe and it is they who have standing to sue under the antitrust scheme.

511 F.Supp. at 533 (citations omitted).

While *Computer Statistics* and *George Sales* allowed suits by competitors of either the buyer or the seller, *Bunker Ramo* restricts standing to competitors of the seller only. *Bunker Ramo* therefore represents a significant narrowing of general antitrust standing principles[5] and the specific standing requirements of section 2(c). As an examination of the language of section 2(c), its legislative history, and the relevant case law will show, the competitive injury requirement of all three of these cases improperly restricts standing to sue under this statute.

■ Any examination of a plaintiff's right to sue under a statute must begin with the language of the statute itself. I find nothing in the language of section 2(c) to justify imposing a competitive injury requirement on potential plaintiffs. Unlike section 2(a) which outlaws price discrimination whose effect "may be substantially to lessen competition or tend to create a monopoly", sections 2(c), (d), and (e) prohibit business practices other than price discrimination. *F. T. C. v. Simplicity Patterns Co.*, 360 U.S. 55, 65, 79 S.Ct. 1005, 1011, 3 L.Ed.2d 1079 (1959). None of these latter sections "requires, as proof of a prima facie violation, a showing that the illicit practice has had an injurious or destructive effect on competition." *Id.*

■ Questions of standing are to be carefully distinguished from issues relating to the existence of a substantive claim under the law. Thus the issue in standing is not whether the plaintiff falls within the literal meaning of the statute, but whether the plaintiff's damages are too remote from the antitrust violation to allow recovery. *Blue Shield of Virginia v. McCready*, —— U.S. ——, 102 S.Ct. 2540, 2547, 73 L.Ed.2d 149 (1982).

Suits for damages by private plaintiffs "injured in ... business or property" are authorized by section 4 of the Clayton Act, 15 U.S.C. § 15. Despite the broad language of this section, not every person tangentially affected by an antitrust violation can sue. Section 4 has long been read to include a requirement that any potential plaintiff under the antitrust laws be within the so-called "target area" of the antitrust violations. *Solinger v. A & M Records*, 586 F.2d 1304, 1310 (9th Cir. 1978); *In re Multidistrict Vehicle Air Pollution*, 481 F.2d 122, 129 (9th Cir. 1972), *cert. denied*, 414 U.S. 1045, 94 S.Ct. 551, 38 L.Ed.2d 336 (1973); *Conference of Studio Unions v. Loew's, Inc.*, 193 F.2d 51, 54–55 (9th Cir. 1951), *cert. denied*, 342 U.S. 919, 72 S.Ct. 367, 96 L.Ed. 687 (1952). Although the exact boundaries of the target area may be the subject of much dispute, the purpose of this requirement is to limit recovery under antitrust law to those entities whom the laws were meant to protect. *McCready*, —— U.S. ——, 102 S.Ct. at 2548; *Brunswick Corporation v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977).

This target area doctrine is most often discussed in connection with suits under sections 1 and 2 of the Sherman Act and has held to mean that the plaintiff must be "within the area of the economy endangered by a breakdown of competitive conditions." 586 F.2d at 1310. This formulation

---

5. *Bunker Ramo* holds in effect that only actual competitors of the parties can suffer competitive injury, while traditional antitrust standing principles have extended standing to a much broader class of persons. *See, e.g., Blue Shield of Virginia v. McCready*, —— U.S. ——, 102 S.Ct. 2540, 2548–49, 73 L.Ed.2d 149 (1982) (subscriber to group health plan has standing to sue for damages resulting from conspiracy between health plan and doctors' organization);

*Ostrofe v. H. S. Crocker Co., Inc.*, 670 F.2d 1378 (9th Cir. 1982) (employee has standing to bring suit against employer when he is forced to resign because of failure to participate in price fixing scheme); *Steiner v. 20th Century-Fox Film Corp.*, 232 F.2d 190 (9th Cir. 1956) (non-operating lessor of theater has standing to sue for conspiracy to monopolize the exhibition of motion pictures).

of the standing requirement is appropriate for actions under sections 1 and 2 since the sole purpose of those sections is to protect competition. *Gordon v. New York Stock Exchange*, 422 U.S. 659, 689, 95 S.Ct. 2598, 2614, 45 L.Ed.2d 463 (1975).

But as the Ninth Circuit has observed on several occasions, section 2(c) is not limited to the protection of competition. *Rangen*, 351 F.2d at 857. A major concern of Congress in promulgating section 2(c) was protection of the fiduciary relationship between a broker and his client.

With regard to the legislative history, defendants cite excerpts which amply demonstrate that, in enacting section 2(c), the prime concern of Congress was to curtail price discriminations accomplished by pseudo-brokerage arrangements. The Supreme Court, in *Federal Trade Comm'n v. Henry Broch & Co.*, 363 U.S. 166, 169, 80 S.Ct. 1158 [1160], 4 L.Ed.2d 1124, noted this principal legislative concern. But, in a footnote (page 169), the Court also expressed the view that the legislative history demonstrates a Congressional intent to proscribe other practices such as the bribing of a seller's broker by the buyer.

This view is further borne out by the statement in the House Report, quoted below, indicating that Congress was concerned with preserving the fiduciary relationship between a broker and his client. *Id.; Calnetics Corporation v. Volkswagen of America, Inc.*, 532 F.2d 674, 696 (9th Cir. 1976). If this concern addressed by Congress in section 2(c) is to be recognized, the scope of standing to sue under it must be expanded to include those who are injured by the destruction of fiduciary obligations.[6]

It was held in an early section 2(c) case, *Fitch v. Kentucky-Tennessee Light & Power Co.*, 136 F.2d 12 (6th Cir. 1943), that a public utility was entitled to maintain a cause of action against one of its coal suppliers who bribed a utility employee to provide coal purchase contracts. The court specifically noted that the coal company's practices had lessened competition in the *sale* of coal but made no mention of an impact on competition among the purchasers. The utility was nevertheless damaged because "it was obliged to pay more for its coal than it would otherwise have paid in a competitive market." *Id.* at 15. The Sixth Circuit analysis of standing in *Fitch* has been followed in the Ninth Circuit. *Calnetics*, 532 F.2d at 695–96: *Rangen*, 351 F.2d at 858–59.

On occasion standing in antitrust cases has been granted or denied depending upon whether the plaintiff fell within certain predesignated categories such as shareholder, lessor, or franchisor.[7] Defendants here suggest a similar *per se* rule denying standing to buyers whose employees are the recipients of commercial bribes. But this use of conclusory labels and "talismanic rubrics" has led to inconsistent and unpredictable results. *Ostrofe v. H. S. Crocker Co., Inc.*, 670 F.2d 1378, 1382 (9th Cir. 1982).

In an effort to remedy the inconsistent results of categorical approaches, the Ninth Circuit has recently stressed the need to consider in every standing analysis the competing policy interests present in denying or granting standing. These are, most notably, "the interest in effective enforcement of the antitrust laws [and] the interest in avoiding vexatious litigation and excessive liability." *Id.* at 1383.

In the case now at hand there is no danger of an excessive or duplicative recovery. As the defendants themselves have suggested, the Utility is regulated and

---

**6.** The Supreme Court has noted in connection with related questions under section 2(a) that standing rules should not be used to exclude those who, like the Municipality, are the principal victims of antitrust violations. *Perkins v. Standard Oil Co.*, 395 U.S. 642, 649, 89 S.Ct. 1871, 1875, 23 L.Ed.2d 599 (1969).

**7.** *See, e.g., Calderone Enterprises Corp. v. United Artists Theatre Circuit*, 454 F.2d 1292 (2d Cir. 1971), *cert. denied*, 406 U.S. 930, 92 S.Ct. 1776, 32 L.Ed.2d 132 (1972) (lessor); *Billy Baxter v. Coca-Cola Co.*, 431 F.2d 183 (2d Cir. 1970), *cert. denied*, 401 U.S. 923, 91 S.Ct. 877, 27 L.Ed.2d 826 (1971) (franchisor); *Walker Distributing Co. v. Lucky Lager Brewing Co.*, 323 F.2d 1 (9th Cir. 1963) (shareholder).

the increased costs it suffered as a result of the bribes are not easily passed on to its customers. There is no overlap between the Municipality's damages, which are measured by the difference between Hitachi's bid price and that of the next lowest bidder, and the damages suffered by Hitachi's competitors, which would be measured by the profits on their lost bids.

The Municipality is also well situated to further the deterrent purposes of the antitrust laws. The Municipality has the best access to its employees and can most easily supervise their performance for signs of wrongdoing. In addition, bribes will generally result in either decreased quality or higher prices, and the Municipality is the one best able to monitor both quality and price.

I conclude that, when commercial bribes are paid to a company's employees to obtain contracts for the sale of goods, the company has standing to bring an action for damages under section 2(c) of the Robinson-Patman Act. 15 U.S.C. § 13(c). This conclusion I believe is consistent with the language of the statute, it's legislative history, and the decisions in this circuit. I reject the analyses of *Bunker Ramo, George Sales,* and *Computer Statistics,* believing that those cases adopt too narrow a view of the intent and purpose of section 2(c).[8]

### 2. Summary Judgment

The Municipality's motion for summary judgment rests on the doctrine of collateral estoppel. In 1978 an indictment was brought in the Central District of California against Hitachi, Marubeni America Corporation, and four individuals charging an illegal conspiracy, 18 U.S.C. § 371, violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1962(c), 1963, and 61 counts of mail fraud, 18 U.S.C. § 1341, wire fraud, 18 U.S.C. § 1343, and interstate travel to commit bribery, 18 U.S.C. § 1952. On September 29, 1980, Hitachi pleaded guilty to all counts of the indictment other than conspiracy and RICO. The Municipality now claims that this plea collaterally estops Hitachi and allows summary judgment to be entered on its Robinson-Patman Act claims.[9]

According to the doctrine of collateral estoppel, issues actually and necessarily determined by a court of competent jurisdiction are conclusive in a subsequent action involving a party to the first litigation even though the later suit is based on different causes of action. *Montana v. United States,* 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1978).

In opposition to summary judgment Hitachi argues that while a criminal conviction may operate as an estoppel, a guilty plea creates at best a rebuttable presumption. This position is contrary to well-established principles of both this circuit and others and must be rejected. *Hinkle Northwest, Inc. v. S.E.C.,* 641 F.2d 1304, 1309 (9th Cir. 1981); *St. Paul Marine & Fire Insurance Co. v. Weiner,* 606 F.2d 864, 868 (9th Cir. 1979); *Ivers v. United States,* 581 F.2d

---

8. Support for this position can also be found in *Grace v. E. J. Kozin Co.,* 538 F.2d 170 (7th Cir. 1976). *Kozin* involved a claim by a seafood company that Kozin had bribed one of its employees. Grace was the trustee in bankruptcy for the S. I. Greene Company, a seafood wholesaler and competitor of the defendant, E. J. Kozin Company. Kozin entered into an agreement with Bernard Kane, an officer of Greene's, whereby Kane represented Kozin as a sales agent. Kane convinced Greene to make purchases from Kozin and received as compensation from Kozin one-half of the latter's profits on the resulting sales. The district court found that Greene had a cause of action against Kozin under section 2(c) and the circuit affirmed.

The precedential value of this opinion is decreased by the dual role in which Greene appears. The court expressly noted that Greene and Kozin were both wholesalers in the same market and were competitors. Since Kozin sold to Greene, however, the two corporations were also related as buyer and seller and were in that sense not competitors. Greene was awarded damages because the price it paid Kozin was higher by the amount of the bribe Kozin paid to Kane. These were not damages to its status as seller and competitor of Kozin, but rather to its status as a buyer.

9. The Municipality also claims that Hitachi is estopped from denying liability on the Sherman Act and RICO claims. *See, infra.*

1362, 1367 (9th Cir. 1978); *United States v. Podell,* 572 F.2d 31, 35 (2d Cir. 1978).[10]

Hitachi claims that the issues presented in the present suit are different from those in the criminal action. In order to resolve this question it is necessary to consider the scope of Hitachi's plea.

■ When only a general judgment of conviction is entered and no special findings are made, the scope of collateral estoppel can be difficult. The pleadings, records of proceedings, evidence submitted, and opinions of the court must all be considered. *Emich Motors v. General Motors,* 340 U.S. 558, 569, 71 S.Ct. 408, 414, 95 L.Ed. 534 (1951); *United States v. Podell,* 572 F.2d at 36.

At the plea hearing in the criminal case, District Judge Matthew Byrne carefully and extensively examined Mr. Naosuke Suzuki, head of the export department of Hitachi Cable, to ascertain the factual basis for Hitachi's plea. The Municipality claims

that Hitachi is estopped to deny any of the statements made by Suzuki at that hearing and that these facts are conclusively admitted. I believe that this position is too broad, but do not need to decide this point since an adequate basis for the application of collateral estoppel can be found in Judge Byrne's findings of fact.

At the conclusion of the plea hearing, Judge Byrne placed on record the factual basis for the plea. He found that at a time no later than 1973 Hitachi and Marubeni agreed to pay McBride and Ellis for prebid information, that funds for the bribes would be contributed by both Hitachi and Marubeni, and that Hitachi's share would be paid to Marubeni in the form of a 4% commission. Marubeni would then pass the commission on to McBride and Ellis as bribes. He also found that Hitachi knew of the bribes and voluntarily participated in the scheme.[11]

---

**10.** *See, also, Green v. Ancora-Citronelle,* 577 F.2d 1380 (9th Cir. 1978) (means of arriving at a judgment do not detract from its conclusiveness).

**11.** The full text of Judge Byrnes' findings is as follows:

I find that there is a basis in fact to the plea of guilty to the counts set forth, and that Mr. Suzuki and Mr. Ransom, and Mr. Suzuki's acceptance and Mr. Allison's statements, indicate that sometime in 1973 and continuing thereafter an express or implied agreement was entered into between Hitachi and Marubeni calling for the payment of funds to Mr. McBride and through and to Mr. Ellis in return for the receipt of certain prebid information that would benefit Marubeni and Hitachi in making bids for certain contracts with the Anchorage Telephone Utility.

The agreement contemplated that the funds to be used in the bribery attempt would be contributed by both Marubeni and Hitachi; that the funds from Hitachi would be provided through a billing process and applied with the funds from Marubeni, would be paid on an approximate 4 percent commission basis to Ellis that would be shared equally with McBride;

That in return for the bribe of McBride he would supply certain prebid information that would be helpful to Hitachi and Marubeni—to Hitachi, in providing the bid, submitting the bid.

That Hitachi believed that under the agreement that Marubeni would take care of the details that would be necessary to carry out the

purpose of this agreement; that one of the purposes of the agreement constituted a scheme to defraud to obtain money by false pretenses.

That Hitachi understood that the bribe and the receipt of information from the bribe would be accomplished by certain interstate travel of various individuals and by the use of certain telexes in foreign and interstate commerce, and by the use of certain bank documents and checks.

That Hitachi aided and abetted in the interstate travel and communication of the telexes and bank documents and checks by providing the funds that were necessary to the accomplishment of the bribe and the scheme attached thereto, and also by utilizing the information that was received in return for the bribe in preparing and processing and submitting the bid based upon the illegally-obtained information.

Mr. Suzuki advises that Hitachi intended to defraud and to obtain money by false pretenses and entered into this scheme to accomplish that intent.

I find that the plea of guilty is freely and voluntarily being entered, and there was no coercion exerted upon Hitachi, either to enter the scheme and carry it out, nor was there any coercion or duress entered upon them to offer these pleas.

The pleas will be accepted and entered. The remaining two counts, upon the government's representation, will be dismissed at the time of sentencing. Plea transcript, pages 59–61.

While the scope of collateral estoppel may be broader than these findings, I am convinced that, at the minimum, collateral estoppel in the present case extends to all elements of the individual crimes to which Hitachi pleaded guilty and all factual findings of the trial judge at the conclusion of the plea. In short, I find that Hitachi is collaterally estopped from denying that it paid bribes to McBride and Ellis in order to secure prebid information on cable contracts with the Municipality.

At earlier dates, only defensive uses of collateral estoppel were allowed. While the defendant on a particular cause of action could assert collateral estoppel as a defense to claims against him, the plaintiff could not in like manner bind the defendant. The Supreme Court in *Parklane Hosiery Company, Inc. v. Shore,* 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979), approved the use of offensive collateral estoppel subject to trial court discretion. The Court identified four particular situations in which application of the doctrine would not ordinarily be justified:

1) when plaintiff in the subsequent litigation could have joined in the original suit;

2) when judgment in the first action is inconsistent with earlier decisions in other cases;

3) where defendant lacked the incentive to litigate the first suit; and

4) where there are procedural opportunities available to the defendant in the second action that were not available in the first that might likely cause a different result.

*Id.* at 330, 99 S.Ct. at 651.

Hitachi claims that since the plea bargain allowed it to pay relatively small fines, it had little incentive to defend in the criminal action. Regardless of the size of the fines eventually paid by Hitachi, the company's potential exposure was large. Hitachi pleaded guilty to a total of 50 criminal offenses providing penalties totaling $185,000 and 250 years in prison. The transcript of the plea proceedings reveal that Hitachi could not have known in advance of the plea the punishment which would be imposed at the time of final disposition. Its incentive to defend must therefore be measured not by the fines it eventually paid, but by the parameters of the potential punishment that might have been imposed. This was more than adequate to give Hitachi incentive to defend the charges. In addition, the serious nature of the criminal charges and the possibility of subsequent civil litigation likely could have entered the minds of Hitachi's management and counsel. *Id.* at 332, 99 S.Ct. at 652.

Hitachi suggests as well that it was denied procedural advantages in the criminal proceeding that would be available in this action. In particular, it claims that it was unable to present witnesses because of threats by the United States Attorney that anyone whose name appeared in Hitachi's or Marubeni's grand jury documents would be arrested if they tried to enter the country and that the trial judge denied its request to depose municipal employees. While depositions are rarely allowed in criminal trials, Fed.R.Crim.P. 15, Hitachi might well have interviewed potential witnesses. Moreover, any overreaching by the United States Attorney could have been remedied by timely addressing the matter before the district court.

All of Hitachi's objections relate to practices which are typical of criminal proceedings. Hitachi's argument therefore implies that the usual manner of proceeding in criminal cases inevitably precludes collateral estoppel in later civil cases. This argument is far too expansive, and I find no unfairness in allowing the use of offensive collateral estoppel here.

Hitachi's final argument is that an element of section 2(c) is the presence of a seller-buyer relationship in commercial bribery. Since the actual sales were made by Marubeni and not Hitachi, this application of the rule would make Hitachi not liable. But the authority relied upon by Hitachi, *Western Fruit Growers Sales Company v. Federal Trade Commission,* 322 F.2d 67 (9th Cir. 1963), does not support such a broad holding. The principal issue in *Western*

*Fruit* was whether a sale had taken place so that the requirement of payment "in connection with the sale or purchase of goods" might be met. In this case there is no question that sales were made.

 When a seller engages in commercial bribery, the actor's liability remains the same whether the bribe is paid to the buyer or the buyer's agent. Were it otherwise, the wrongdoer would always be insulated from liability by placing an intermediary to accomplish indirectly a criminal act. *Federal Trade Commission v. Henry Broch & Co.,* 363 U.S. 166, 80 S.Ct. 1158, 4 L.Ed.2d 1124 (1960); *Rangen, Inc. v. Sterling Nelson & Sons,* 351 F.2d 851, 862 (9th Cir. 1965). Section 2(c) must be applied in a rational manner and commercial bribery by the seller is a violation whether the bribe is made through intermediaries, agents, or brokers. Under the facts of this case, Marubeni acted as a broker for Hitachi goods in connection with sales to the Municipality and the bribe was in the form of a 4% "commission" passed along to Ellis and McBride. I conclude this is precisely the sort of illicit brokerage payment section 2(c) was designed to prohibit.

I hold that Hitachi is collaterally estopped from denying payment of bribes to employees of the Municipality in the form of illicit brokerage commissions. The Municipality's motion for summary judgment on liability on its claims under section 2(c) of the Robinson-Patman Act is GRANTED.

### B. *RICO*

The Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–68, prohibits several types of activity which Congress believed to be characteristic of organized crime: 1) using income derived from a pattern of racketeering activity to acquire an interest in an enterprise, 2) acquiring an interest in an enterprise by means of a pattern of racketeering activity, 3) conducting the affairs of a business through a pattern of racketeering activity, and 4) conspiring to commit any of the above. 18 U.S.C. § 1962. The statute defines "racketeering activity" as any one of a number of enumerated state and federal offenses including, among others, mail fraud, 18 U.S.C. § 1341, and wire fraud, 18 U.S.C. § 1343. 18 U.S.C. § 1961(1). Any two acts of racketeering activity are considered to be a pattern of racketeering activity as long as the second occurred within ten years of the first. 18 U.S.C. § 1961(5).

 Under traditional theories of collateral estoppel, Hitachi's pleas of guilty to the mail and wire fraud counts estop it from denying that it engaged in a pattern of racketeering activity. RICO also requires, however, that an enterprise be acquired or conducted through the pattern of racketeering activity or that income from the pattern of racketeering was used to acquire, establish, or operate an enterprise. 18 U.S.C. § 1962. The record of the earlier criminal proceedings does not reveal what disposition Hitachi made of income from transactions with the Municipality. While the Municipality asserts that the income Hitachi received could not conceivably have been used for any purpose not covered by RICO, it has presented no evidence to show what use was actually made of any income improperly derived.

RICO is an intricate statute and its interpretation has caused considerable difficulty. *See e.g.,* Long, *Treble Damages for Violations of the Federal Securities Laws; A Suggested Analysis and Application of the RICO Civil Cause of Action,* 85 Dick.L.Rev. 201 (1981); Stafer, Massumi, and Skolnick, *Civil RICO in the Public Interest: "Everybody's Darling",* 19 Am.Crim.L.Rev. 655 (1982). The problems that it poses can best be considered in the light of a fuller factual record than is now available. The Municipality's motion for summary judgment with respect to its RICO claim is DENIED.[12]

---

**12.** Hitachi has attached to its briefs the text of several trial court decisions in which a cause of action under RICO was dismissed for lack of standing. *Waterman Steamship Corp. v.* *Avondale Shipyards, Inc.,* 527 F.Supp. 256 (E.D.La.1981); *Landmark Savings & Loan v. Loeb Rhoades, Hornblower & Co.,* 527 F.Supp. 206 (E.D.Mich.1981); *Alice M. Harper v. New*

### C. *The Sherman Act*

The Municipality has also moved for summary judgment on its claim under section 1 of the Sherman Act. Commercial bribery does not in itself constitute a violation of the Sherman Act. *Calnetics,* 532 F.2d 674, 687. When the bribery is coupled with other acts tending to restrain trade, a claim under the Sherman Act may be established. While commercial bribery has been proven, the evidence of other anti-competitive acts is insufficient to establish claims under the Sherman Act. *Poller v. Columbia Broadcasting System,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962); *Beltz Travel Service v. International Air Transport Association,* 620 F.2d 1360, 1364 (9th Cir. 1980). The Municipality's motion for summary judgment on these claims is DENIED.

*Japan Securities International, Inc.,* 545 F.Supp. 1002 (C.D.Cal.1982); *North Barrington Development, Inc. v. Richard Fanslow,* 547 F.Supp. 207 (N.D.Ill.1980). No motion to dismiss the Municipality's RICO claim for lack of standing has been filed and the issue has not been adequately briefed. I therefore will not consider it here.