**IN TOWN HOTELS LIMITED PARTNERSHIP, fka In Town Hotels, Ltd., and in Town Hotels, Inc., Plaintiffs,**

v.

**MARRIOTT INTERNATIONAL, INC., and Avendra, LLC, Defendants.**

**No. CIV.A. 2:02–0481.**

United States District Court, S.D. West Virginia, Charleston Division.

Feb. 25, 2003.

---

1. Defendant is not relieved of his disclosure obligations under Rule 16(b) of the Federal Rules of Criminal Procedure.

Benjamin L. Bailey, Brian A. Glasser, & Jennifer S. Fahey, Bailey & Glasser, LLP, Charleston, WV, Edward P. Tiffey, Charleston, WV, William M. Bosch & Brian H. Corcoran, Katten Muchin Zavis Rosenman, Washington, DC, for Plaintiffs In Town Hotels Limited Partnership and In Town Hotels, Inc.

James R. Snyder & John Philip Melick, Jackson Kelly PLLC, Charleston, WV, Karen Grubber, Marriott International, Inc., Bethesda, MD, Patrick Lynch, O'Melveny & Myers, Los Angeles, CA, for Defendant Marriott International, Inc.

John J. Polak, Rose & Atkinson, Charleston, WV, Mark London & Christopher B. Mead, London & Mead, Washington, DC, for Defendant Avendra, LLC.

## MEMORANDUM OPINION AND ORDER

GOODWIN, District Judge.

Pending is defendant Marriott International, Inc.'s motion to dismiss Counts IV and XIV [Docket 15] and defendant Avendra, LLC's motion to dismiss all counts [Docket 18]. For the following reasons,

the court **DENIES** Marriott's motion to dismiss Counts IV and XIV. The court **GRANTS in part and DENIES in part** Avendra's motion to dismiss all counts. Specifically, the court **DISMISSES** count VI (fraud) as against Avendra for failure to plead fraud with specificity.

## I. Background

The plaintiffs, In Town Hotels Limited Partnership and In Town Hotels, Inc. (collectively, "In Town Hotels"), brought suit against Marriott International, Inc. (Marriott) and Avendra, LLC (Avendra), alleging breach of contract, breach of fiduciary duty, negligence, and fraud arising out of Marriott's management of the plaintiffs' hotel, known as the Charleston Town Center Marriott (the Hotel). In an amended complaint, the plaintiffs further alleged that Marriott and Avendra violated the West Virginia Unfair Practices Act (WVUPA), W. Va.Code § 47–11A–3, as well as § 2(c) of the Robinson–Patman Act, 15 U.S.C. § 13(c), a federal antitrust provision which prohibits the payment and acceptance of commissions that are not in exchange for services rendered.

Because the court is considering motions to dismiss, the following facts are set out as alleged by the plaintiffs in the complaint. For approximately twenty years the plaintiffs have contracted with Marriott to manage the plaintiffs' Hotel. Under the terms of the contract, Marriott is granted unfettered authority to manage and control the Hotel. The contract purports to create an agency relationship between Marriott and In Town Hotels whereby Marriott has a fiduciary duty to operate the Hotel solely for the benefit of the plaintiffs. The contract provides that Marriott's compensation for its services would consist solely of management fees as set forth in the agreement. For the purpose of their antitrust claim, the plaintiffs

allege that Marriott, acting in conjunction with Avendra, entered into exclusive or preferred contracts with vendors to provide goods to the Hotel. In so doing, Marriott and Avendra solicited and received "sponsorship funds," which were payments and rebates by vendors made in the course of selling, or in exchange for the opportunity to sell, goods to the Hotel. Marriott and Avendra retained these payments and rebates for themselves and did not disclose them to the plaintiffs. As a consequence, the plaintiffs allege, the Hotel has been restricted in its choice of vendors, has paid a higher price for goods than it would otherwise have paid, and has suffered vis-a-vis rival hotels (some of which are owned or managed by Marriott) that are not paying these higher prices.

According to the plaintiffs, this scheme violates, among other things, section 2(c) of the Robinson–Patman Act as well as the WVUPA, and entitles them to treble damages. Marriott moved to dismiss both of these claims. Marriott argues that the plaintiffs have failed to allege that they have suffered an antitrust injury and that without such an allegation they lack standing to bring a section 2(c) claim. In addition, Marriott argues that the plaintiffs have failed to allege an injury to a competitor, a requirement of § 47–11A–3 of the WVUPA. The plaintiffs respond that they have adequately plead the necessary injuries for both statutes.

Avendra filed a separate motion to dismiss all claims against it. It joins in Marriott's arguments regarding the Robinson–Patman Act and the WVUPA. It also claims that the contract specifically authorizes all of the alleged conduct, and thus that all counts should be dismissed. Finally, it argues that the bulk of the plaintiffs' claims are fraud-based and that these claims must be dismissed because the plaintiffs have failed to plead fraud with

particularity. The plaintiffs respond that the contract does not authorize the conduct in question, and that they have plead all counts with adequate specificity.

The court will first address Marriott's motion regarding the Robinson–Patman Act and the WVUPA. The court will then turn to Avendra's additional grounds for dismissal.

## II. Marriott's Motion to Dismiss

### A. Robinson–Patman Act section 2(c) Claim

The plaintiffs allege that Marriott's receipt of undisclosed payments and rebates in the course of purchasing goods for the Hotel violates section 2(c) of the Robinson–Patman Act. Section 2(c) provides, in pertinent part, that:

> It shall be unlawful for any person engaged in commerce, in the course of such commerce, to pay or grant, or to receive or accept, anything of value as a commission, brokerage, or other compensation, ... except for services rendered in connection with the sale or purchase of goods, wares, or merchandise ....

15 U.S.C. § 13(c) (West 2003). This provision has been described as a "prolix and obscure statute [which] is a model of bad drafting." XIV Herbert Hovenkamp, *Antitrust Law* ¶ 2362, at 219 (1999) [hereinafter Hovenkamp]. Thankfully, the Supreme Court has provided a useful explanation of the intent and function of section 2(c). In *FTC v. Henry Broch & Co.*, 363 U.S. 166, 80 S.Ct. 1158, 4 L.Ed.2d 1124 (1960), the Court explained that "[t]he Robinson–Patman Act was enacted in 1936 to curb and prohibit all devices by which large buyers gained discriminatory preferences over smaller ones by virtue of their greater purchasing power." *Id.* at 168, 80 S.Ct. 1158. Prior

to the Act, large buyers were obtaining indirect price concessions while evading the Clayton Act's prohibitions on direct price discrimination. *Id.* at 168–69, 80 S.Ct. 1158. They did this by "setting up 'dummy' brokers who were employed by the buyer and who, in many cases, rendered no services. The large buyers demanded that the seller pay 'brokerage' to these fictitious brokers who then turned it over to their employer." *Id.* at 169, 80 S.Ct. 1158.

In response to this practice, Congress passed section 2(c) of the Robinson–Patman Act, which prohibits brokerage or similar payments in the absence of services rendered for those payments. "Congress in its wisdom phrased section 2(c) broadly, not only to cover the other methods then in existence but all other means by which brokerage could be used to effect price discrimination." *Id.* Indeed, the Court noted that "the [Congressional] debates on the bill show clearly that section 2(c) was intended to proscribe other practices such as the 'bribing' of a seller's broker by the buyer." *Id.* at 169 n. 6, 80 S.Ct. 1158 (citing 80 Cong. Rec. 7759–60, 8111–12). Thus, the Court indicated in *Henry Broch & Co.* that section 2(c) reaches commercial bribery as well as the use of dummy brokers to obtain indirect price discrimination. This statement from *Henry Broch & Co.* has been characterized as dicta, but most courts interpreting section 2(c) have concluded that it does prohibit commercial bribery. *See Stephen Jay Photography, Ltd. v. Olan Mills, Inc.*, 903 F.2d 988, 992 & n. 6 (4th Cir.1990) ("commercial bribery" language is dicta, but noting cases recognizing section 2(c)'s application to commercial bribery).

In this case, the plaintiffs allege that Marriott, acting in conjunction with Avendra, received rebates and payments—so-called "sponsorship funds"—from vendors

in the course of or in exchange for the opportunity to do business with the Hotel. These payments and rebates were not related to services rendered by Marriott, the plaintiffs allege, but were essentially commercial bribes of Marriott, which was supposed to be acting solely in the interest of In Town Hotels, not in its own conflicting self-interest. Marriott has not asserted that section 2(c) does not reach commercial bribery, nor has it attacked the merits of the plaintiff's claim under section 2(c). Rather, Marriott argues that even if the plaintiffs have adequately stated a section 2(c) claim, they lack standing to pursue that claim because they have not alleged an antitrust injury.

■ The private cause of action for antitrust violations is provided in section 4 of the Clayton Act, which states that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States." 15 U.S.C. § 15(a) (West 2003). According to the Supreme Court, this means that not every private party who is somehow injured as a result of conduct forbidden by the antitrust laws has standing to bring a private antitrust suit. Rather, an antitrust plaintiff "must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). Accordingly, even when a plaintiff properly alleges a clear antitrust violation, the plaintiff will nonetheless suffer dismissal if it does not allege that it suffered an antitrust injury. *See Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334–35, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990).

■ It is important to clearly distinguish between the elements of the substantive antitrust violation and the antitrust injury requirement. In certain cases an antitrust plaintiff must prove, as part of the substantive antitrust claim, that the conduct in question injured competition as a whole. For example, a plaintiff seeking to prove a unilateral monopoly under section 2 of the Sherman Act, 15 U.S.C. § 2, must prove that the defendant's conduct actually "pose[s] a danger of monopolization." *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984). In contrast, "[c]ertain agreements, such as horizontal price fixing and market allocation, are thought so inherently anticompetitive that each is illegal per se [under section 1 of the Sherman Act] without inquiry into the harm it has actually caused." *Id.* Violations of this sort, where injury to competition is presumed, are referred to as *per se* antitrust violations. Thus, depending on the conduct in question and the antitrust provision involved, an antitrust plaintiff may or may not be required to prove injury to competition in order to state an antitrust claim. The Fourth Circuit has held that section 2(c) violations are *per se* antitrust violations, meaning that the plaintiff need not prove injury to competition in order to prove that the defendant has violated section 2(c). *Metrix Warehouse, Inc. v. Daimler–Benz Aktiengesellschaft*, 716 F.2d 245, 247 (4th Cir.1983) ("Nothing in the language of section 2(c) ... requires proof of an adverse effect on competition before a violation may be found where there is an admitted payment of a commission or other compensation to an agent of the purchaser.").

■ Regardless of whether the defendant has violated section 2(c), however, the question remains whether the plaintiff has standing to bring suit for that violation.

The Supreme Court has made clear that even in the case of *per se* antitrust violations, where the plaintiff need not prove actual harm to competition as an element of the substantive violation, the plaintiff still must prove that its injury was of the type the antitrust laws were intended to prevent. *Atlantic Richfield*, 495 U.S. at 339–40, 110 S.Ct. 1884. All private antitrust plaintiffs must allege an antitrust injury, "regardless of the type of antitrust claim involved." *Id.* at 340, 110 S.Ct. 1884. When the purpose of an antitrust provision is to prevent injury to competition, a plaintiff must always prove that it was injured as a result of injury to competition in order to show antitrust injury. Even when the defendant's conduct is presumed to injure competition, the question remains whether this particular plaintiff's injury was caused by the competition-reducing aspect of the defendant's conduct. Thus, the fact that injury to competition is not an element of a section 2(c) offense does not mean, as some might assume, that a section 2(c) plaintiff need not show that its injury resulted from harm to competition.[1] If the purpose of section 2(c), in all cases, were to protect competition, then the plaintiffs would be required to allege and prove "competitive injury," meaning an injury flowing from the competition-reducing aspect of the defendant's conduct, even if the defendant's conduct was inherently harmful to competition. But if the purpose of section 2(c) is not always to protect competition, then it is at least an open question whether the plaintiffs must prove competitive injury to satisfy the antitrust injury requirement.

The focus point of the disagreement between the plaintiffs and the defendant lies in their understandings of what constitutes antitrust injury in the context of a claim under section 2(c). Marriott contends that antitrust injury requires proof that the plaintiffs' injury resulted from "a competition-*reducing* aspect or effect of the defendant's behavior." *Id.* at 344, 110 S.Ct. 1884. In contrast, the plaintiffs contend that antitrust injury is simply "injury of the type the antitrust laws were intended to prevent." *Brunswick Corp.*, 429 U.S. at 489, 97 S.Ct. 690. In some cases, the plaintiffs acknowledge, the type of injury the antitrust laws were intended to prevent is a reduction in competition. This is true, for example, in claims brought under section 1 of the Sherman Act, the provision at issue in *Atlantic Richfield*. Section 2(c), the plaintiffs argue, is different: unlike most provisions of the federal antitrust laws, section 2(c) is intended to protect an individual firm from losses caused by commercial bribery (among other things), not to protect the competitive process as a whole. Accordingly, the plaintiffs say that in the context of section 2(c), an "injury of the type the antitrust laws were intended to prevent" is a firm's loss resulting from commercial bribery, not a loss resulting from a competition-reducing aspect of that bribery.

There is force to both parties' positions, and the caselaw does not provide a clear resolution of the issue. The Supreme Court cases discussing the antitrust injury requirement illustrate the ambiguity in the caselaw on this point. For example, in *Brunswick*, the Court first defines antitrust injury as "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." 429 U.S. at 489, 97 S.Ct. 690. Under this definition, it seems that the court should inquire as to the type of injury that the antitrust provision in question was intended to prevent.

---

1. If it did, then the Fourth Circuit's decision in *Metrix Warehouse* would provide a quick resolution to the antitrust injury requirement in this case.

Courts have explained that the particular antitrust provision at issue here—section 2(c)—was designed to "protect[ ] *those who compete* with a favored seller, not just the overall competitive process." *Monahan's Marine, Inc. v. Boston Whaler, Inc.*, 866 F.2d 525, 529 (1st Cir.1989) (Breyer, Circuit Judge). Thus section 2(c) of the Robinson–Patman Act is unlike other provisions of antitrust law, such as the Sherman Act, which is only "concern[ed] with the protection of competition, not competitors." *Brown Shoe Co. v. United States*, 370 U.S. 294, 320, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962).

The defendants argue that regardless of any additional purposes of the specific antitrust provision at issue, the Supreme Court has made clear that injury to competition is always a necessary part of antitrust injury. For example, in *Brunswick*, after describing an antitrust injury as "injury of the type the antitrust laws were intended to prevent," the Court immediately went on to say that "[t]he injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." 429 U.S. at 489, 97 S.Ct. 690. According to the defendants, this second statement clarifies the first—it means that the type of injury that the antitrust laws were intended to prevent *always* results from the anticompetitive nature of the antitrust violation, regardless of whether one is dealing with section 1 of the Sherman Act—which is designed to protect the competitive process—or section 2(c) of the Robinson–Patman Act—which is designed to protect individual competitors. If any ambiguity exists in *Brunswick*, the defendants argue, it was resolved by *Atlantic Richfield*, where the Court seems to equate antitrust injury with injury to competition. *See, e.g., Atlantic Richfield*, 495 U.S. at 339, 110 S.Ct. 1884 ("Antitrust injury does not arise for purposes of section 4 of the Clayton Act ... until a private party is adversely affected by an anticompetitive aspect of the defendant's conduct."); *id.* at 340, 110 S.Ct. 1884 ("Low prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition. Hence, they cannot give rise to antitrust injury.").

The court does not agree that these statements from *Brunswick* and *Atlantic Richfield* resolve the matter. While the Court in *Brunswick* and *Atlantic Richfield* seems to assume that preventing injury to competition is always the purpose of the antitrust provision in question, both cases involve the Sherman Act, not the Robinson–Patman Act. In this case, which involves an antitrust provision that was not designed to protect competition, but rather to protect individual competitors, this court concludes that the above statements from *Brunswick* and *Atlantic Richfield* are not relevant. Instead, the fundamental rule from both cases is that the court must "ensure[ ] that the harm claimed by the plaintiff corresponds to the rationale for finding a violation of the antitrust laws in the first place." *Id.* at 342, 110 S.Ct. 1884. The court therefore turns to consider the rationale behind the particular antitrust provision at issue here, namely section 2(c).

Cases directly addressing the issue of antitrust injury in the context of section 2(c) claims have reached different conclusions about the meaning of antitrust injury. Some cases hold that a competitive injury must be proven to satisfy the antitrust injury requirement. *See, e.g., Hansel 'N Gretel Brand, Inc. v. Savitsky*, No. 94 Civ. 4027, 1997 WL 543088, at *8 (S.D.N.Y. Sept.3, 1997); *Miyano Mach. USA, Inc. v. Zonar*, No. 92 C 2385, 1993 WL 23758, at *8 (N.D.Ill. Jan.29, 1993); *NL Indus., Inc. v. Gulf & Western Indus.*,

*Inc.*, 650 F.Supp. 1115, 1124 (D.Kan.1986); *Fed. Paper Bd. Co. v. Amata*, 693 F.Supp. 1376, 1388 (D.Conn.1988); *Bunker Ramo Corp. v. Cywan*, 511 F.Supp. 531, 533 (N.D.Ill.1981).[2] Other cases hold that the antitrust injury requirement can be met in the context of a section 2(c) claim without any proof of any sort of competitive injury. *See, e.g., Philip Morris, Inc. v. Grinnell Lithographic Co.*, 67 F.Supp.2d 126, 134 (E.D.N.Y.1999); *Edison Elec. Inst. v. Henwood*, 832 F.Supp. 413, 418–19 (D.D.C. 1993); *Municipality of Anchorage v. Hitachi Cable, Ltd.*, 547 F.Supp. 633 (D.Alaska 1982).[3] The courts adopting the two ap-

**2.** The only circuit court decision arguably adopting this approach is *Larry R. George Sales Co. v. Cool Attic Corp.*, 587 F.2d 266 (5th Cir.1979). In this court's opinion, however, the *Cool Attic* opinion leaves it unclear whether injury to a competitor or injury to competition is necessary for antitrust injury. The plaintiff in *Cool Attic* was an independent broker hired on commission by an attic fan manufacturer to arrange sales to attic fan distributors. *Id.* at 269. Eventually, however, the purchasing agent for the attic fan distributor began dealing directly with the manufacturer and began demanding and receiving commissions from the manufacturer. *Id.* The independent broker brought a section 2(c) commercial bribery claim, but the court dismissed the claim for lack of antitrust injury. The independent broker's only injury, the court explained, arose from the breach (if any) of the brokerage agreement, not from the fact that the purchasing agent was now allegedly receiving illegal commissions from the manufacturer. *Id.* at 272. Thus, the independent broker had not suffered an antitrust injury.

Certain aspects of the court's reasoning appear to support the defendant's position. For example, the court stated that "[r]ecovery and damages under the antitrust law is available to those who have been directly injured by the lessening of competition." *Id.* at 271. At another point, however, the court stated that "[o]nly if Plaintiff was in the same business and in competition with [either the manufacturer or the distributor] ... would he have standing." *Id.* at 272. This implies that injury to an individual competitor, regardless of injury to competition as a whole, would suffice for antitrust injury standing. The lack of clarity on this point is understandable, as the plaintiff in *Cool Attic* lacked standing under either theory of antitrust injury. Because of the ambiguities in *Cool Attic* regarding the precise contours of antitrust injury, this court does not rely on that case.

**3.** Several other cases are sometimes cited by courts as holding that injury to competition need not be alleged to satisfy antitrust injury for a section 2(c) claim, but these cases do not address the antitrust injury standing requirement directly and thus are not reliable precedent on point. For example, in *Fitch v. Kentucky–Tennessee Light & Power Co.*, 136 F.2d 12, 15 (6th Cir.1943), the court affirmed a judgment for a section 2(c) plaintiff whose employee had been bribed, stating that "the buyer is suing for damages ... because, on account of the fraud, it was obliged to pay more for its coal than it would otherwise have paid in a competitive market." Thus the court permitted a claim, very similar to the one alleged here, based on injury to a competitor without also requiring proof of injury to competition. However, it seems that the parties did not raise the issue of standing and antitrust injury, and the court never mentioned the antitrust injury requirement. The plaintiffs also cite *2660 Woodley Rd. Joint Venture v. ITT Sheraton Corp.*, No. Civ. A. 97–450, 2002 WL 53913 (D.Del. Jan 10, 2002), where the court held that the plaintiff had produced sufficient evidence to prove antitrust injury based on evidence that the hotel had suffered higher purchasing costs vis-a-vis its rivals as a result of the commercial bribery. *Id.* at *9. But the defendant in *2660 Woodley Road* only argued that the evidence was insufficient to prove that the hotel had in fact paid higher prices than other hotels, not that such an injury, even if proven, would not constitute an antitrust injury. *Id.* at *8. Therefore, the court did not address the issue of whether an antitrust injury must result from an injury to competition. *See also Calnetics Corp. v. Volkswagen of Am.*, 532 F.2d 674, 696 (9th Cir.1976) (holding, without acknowledging the antitrust injury requirement, that "if [Volkswagen Pacific] is able on remand to prove that [Calnetics] indeed committed acts of commercial bribery in violation of section 2(c), then the defendants ought to be allowed any damages proximately caused by that violation.").

proaches primarily disagree about the purpose of section 2(c) in relation to the antitrust laws generally.

On the one hand, the court in *Bunker Ramo* explained that "[a]s envisioned by Congress and interpreted by the courts, section 2(c) is designed to protect and promote competition among businesses competing at the same functional level in the marketing chain." *Id.* at 533. Similarly, the court in *Federal Paper Board Co.* stated that "[e]ven though there is evidence in the legislative history that Congress may have additionally intended for section 2(c) to prohibit commercial bribery, it appears that the main purpose of section 2(c) was to close the 'brokerage' loophole in the laws regulating price discrimination." *Id.* at 1388 (citations omitted). The court then concluded that "[i]n light of the primary purpose of section 2(c), this court believes that the antitrust injury requirement ... requires a plaintiff suing for treble damages for violations of section 2(c) to show that the probable affect of the discrimination would be to allow the favored competitor to draw sales or profits from him, the unfavored competitor." *Id.* (quotations omitted). Generally speaking, then, these courts reason that because section 2(c) was "primarily" intended to protect competitors against price discrimination resulting from dummy brokers, the antitrust injury requirement in the context of section 2(c) requires a showing of an injury flowing from this practice.

Other courts have not interpreted the goals of section 2(c) so narrowly. In contrast to the above-cited cases, the court in

*Edison Electric Institute* claimed that "[i]n enacting section 2(c), Congress had at least *two* objectives: to prevent large buyers from extracting hidden price discounts from suppliers in the form of 'dummy brokerage' payments; and to prohibit commercial bribery that tended to undermine the fiduciary relationship between a buyer and its agent," 832 F.Supp. at 418 (emphasis added) (citing *Stephen Jay Photography, Ltd. v. Olan Mills, Inc.*, 903 F.2d 988, 991–93 (4th Cir.1990); S.Rep. No. 1502, 74th Cong., 2d Sess. 7 (1936)). The court criticized the reasoning of *Federal Paper Board Co.*, stating that it "rested solely on the price discrimination/dummy brokerage rationale of section 2(c) and ignored the commercial bribery rationale." *Id.* at 419. Similarly, in *Municipality of Anchorage* the court acknowledged that "the prime concern of Congress was to curtail price discriminations accomplished by pseudo-brokerage arrangements," but noted that this was not the only purpose behind the statute. *Id.* at 640. Another "major concern of Congress in promulgating section 2(c) was protection of the fiduciary relationship between a broker and his client." *Id.* Accordingly, the court concluded that a plaintiff alleging an injury stemming from a violation of the broker-client fiduciary relationship satisfied the antitrust injury requirement just as much as a plaintiff alleging injury from price discrimination flowing from dummy brokers. *Id.* at 641. *See also Philip Morris, Inc.*, 67 F.Supp.2d at 133–34 (holding that plaintiff had alleged antitrust injury because injury "was the direct result of commercial bribery, an activity outlawed by section 2(c)").[4]

**4.** The plaintiffs quote at length from the court's decision in *Philip Morris*. This court has not discussed that case extensively, in part because the court does not fully endorse the reasoning in *Philip Morris*. For example, the court in *Philip Morris* declined to impose a "competitive injury" requirement on section

2(c) plaintiffs because, among other things, it concluded that commercial bribery always injures competition. *See Philip Morris*, 67 F.Supp.2d at 134–36. As the defendant points out, this analysis confuses the elements of a section 2(c) claim—which does not require proof of injury to competition—with the

All of the cases discussed above acknowledge the instructions from *Brunswick* that antitrust injury is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp.*, 429 U.S. at 489, 97 S.Ct. 690. As explained, they differ in their interpretations of what type of injury section 2(c) was intended to prevent. The Fourth Circuit has not addressed the antitrust injury requirement in the context of section 2(c).[5] Nonetheless, the Fourth Circuit has addressed the purposes behind section 2(c), and this discussion sheds light on how that court might interpret the antitrust injury requirement in the context of section 2(c) claims. In *Stephen Jay Photography, Ltd. v. Olan Mills, Inc.*, 903 F.2d 988 (4th Cir.1990), the Fourth Circuit considered whether payments by a photographer to a school district for the privilege of taking student photos constituted commercial bribery under section 2(c). The Fourth Circuit, noting that most courts recognize claims for commercial bribery under section 2(c), assumed without deciding that section 2(c) applies to certain types of commercial bribery. *Id.* at 993. Even so, the court concluded, section 2(c) only reaches bribery that crosses the seller-buyer line—for example, when the seller makes a payment to an agent of the buyer. *Id.* In *Stephen Jay*, the court concluded that the school was not acting as the students' agent when it arranged for the photographer. *Id.* Thus, the payment from the photographer to the school district did not cross a buyer-seller line and did not violate section 2(c).

In the course of reaching this conclusion, the court discussed the purposes behind section 2(c). The court noted that while one main purpose behind section 2(c) was to prevent large buyers from using dummy brokers to circumvent discriminatory price prohibitions, Congress also intended section 2(c) to protect the fiduciary relationship between a broker and his client. *Id.* at 991–92. The court noted several passages from the legislative history to section 2(c) that the Supreme Court had cited in *Henry Broch & Co.*, 363 U.S. at 169–70 n. 6, 80 S.Ct. 1158, as examples of the type of commercial bribery that Congress targeted in section 2(c). For example, the court quoted a statement from Senator Patman:

> There is a merchant in Virginia representing potato growers. He sells thousands of cars of potatoes a year, and our investigation has disclosed that he had a secret contract with a large mass corporate chain buyer by which he obligated himself to sell every car of those potatoes of those farmers to this large buyer .... This man representing the farmers sold those potatoes to that mass buyer, fixing the price himself, and what did he get out of it? He got a secret rebate of

antitrust injury standing requirement of section 4 of the Clayton Act—which limits private party standing to those injured in the manner the antitrust laws were designed to prevent. Whether the defendant's conduct is inherently harmful to competition is a different question from whether the plaintiff was injured as a result of the competition-reducing aspect of that behavior. *See Atlantic Richfield*, 495 U.S. at 335, 110 S.Ct. 1884 (even for *per se* Sherman Act claim, in which injury to competition is presumed, the plaintiff must still prove competitive injury to have

standing under section 4). This is not to say that this court disagrees with the *Philip Morris* court at all points in the analysis. The court simply wishes to emphasize, particularly in light of the plaintiffs' heavy reliance on *Philip Morris*, that it does not fully adopt the reasoning of *Philip Morris* (or any other decision cited), except to the extent that the court does so expressly in this opinion.

**5.** Indeed, as indicated in footnotes 2 and 3, no circuit court has directly addressed this issue.

$2.50 to $5 on every car that the farmers knew nothing about .... That is the kind of dummy-brokerage arrangement we are trying to prohibit in this bill.

*Stephen Jay*, 903 F.2d at 993 (quoting 74 Cong. Rec. 8111–12 (1936) (statement of Sen. Patman)). The court explained that statements such as Senator Patman's "refer to the corruption of an agency relationship." *Id.* at 993. Thus, the court in *Stephen Jay* inferred, although did not hold, that allegations of commercial bribery involving corruption of the agency relationship state a claim under section 2(c).[6] The court's reasoning in *Stephen Jay* suggests that corruption of the agency relationship is the type of injury that section 2(c) was intended to prohibit.

■ This court concludes that it is a mistake to focus solely on the dummy brokerage/price discrimination purpose behind section 2(c). It may be the case that the dummy brokerage/price discrimination purpose fits more easily with the pro-competition purposes of antitrust law generally.[7] But this court's job is to apply the law as written, not to second-guess the wisdom or efficacy of the statutes passed by Congress. Looking at the text and legislative history of section 2(c), there is no justification for implying that section 2(c) has only pro-competition purposes. As explained in *Stephen Jay*, one of the purposes of section 2(c) was to protect against "the corruption of an agency relationship." *Id.* at 993. It is certainly debatable whether concern over the corruption of the agency

relationship is a matter that appropriately belongs in the antitrust laws, *see* Keller W. Allen & Meriwether D. Williams, *Commercial Bribery, Antitrust Injury and Section 2(c) of the Robinson–Patman Anti–Discrimination Act*, 27 Gonz. L.Rev. 167, 177–78 (1990–91), but to date Congress has neither repealed nor rewritten section 2(c). *See* Hovenkamp ¶ 2340a, at 118 (noting that "[v]ery few statutes have survived such long-lived and unrelenting criticism as has been directed against the Robinson–Patman Act"). Accordingly, the court concludes that in the context of a claim under section 2(c), the antitrust injury standing requirement is met when a plaintiff alleges an injury flowing from "the corruption of an agency relationship." *Stephen Jay*, 903 F.2d at 993.

■ In this case, the plaintiffs allege that Marriott served as the agent for In Town Hotels in procuring and purchasing goods and supplies for the hotel. In its capacity as the agent of In Town Hotels, Marriott received undisclosed payments and rebates from vendors for the opportunity to sell goods to In Town Hotels. These allegations fit the terms of section 2(c), which renders it unlawful "for any person engaged in commerce, in the course of such commerce, ... to receive or accept, anything of value as a commission, brokerage, or other compensation, ... except for services rendered in connection with the sale or purchase of goods, wares, or merchandise." 15 U.S.C. § 13(c). It is also useful to compare the plaintiffs' allegations

---

**6.** *Stephen Jay* simply holds the converse—that alleged commercial bribery that does not involve corruption of the agency relationship does not violate section 2(c).

**7.** Although for that matter, it is not clear whether even this aspect of section 2(c) fits within the broader goals of the antitrust laws. Even as to its dummy brokerage/price discrimination function, section 2(c), like the Robinson–Patman Act as a whole, has been

roundly criticized for being out of step with, and in some cases in direct conflict with, the general pro-competition aims of the antitrust laws. *See* Hovenkamp ¶ 2301 (explaining that price discrimination by a supplier among various dealers is not, absent market power, harmful to competition); *id.* ¶ 2362, at 234 (results under section 2(c) "can be quite at odds with general antitrust goals").

to the case of Senator Patman's potato farmer. There, the potato farmer's selling agent "'sold th[e] potatoes to [a] mass buyer, fixing the price himself, and [the agent] ... got a secret rebate.'" *Stephen Jay*, 903 F.2d at 993 (quoting 74 Cong. Rec. 8111–12 (1936)). Similarly in this case, the plaintiffs allege that their agent purchased hotel goods from vendors and received secret payments and rebates from those vendors that it did not pass along to In Town Hotels. Contrary to the facts in *Stephen Jay*, where the court dismissed the plaintiffs' claim, the alleged payment in this case crosses the seller-buyer line. The plaintiffs allege that Marriott, an agent for the buyer (In Town Hotels), received payments from the seller-vendors. Thus, the plaintiffs here have alleged a corruption of the agency relationship which crosses the seller-buyer line.

The plaintiffs allege that they were injured by this conduct in two ways: (1) they were deprived of the rebates and payments to which they were entitled, and (2) they lost business vis-a-vis their competitors, because they paid higher prices for their hotel supplies.[8] These injuries are typical harms caused by commercial bribery in the form of corruption of the agency relationship, and thus are injuries of the type that section 2(c) was intended to prevent. Accordingly, the plaintiffs have adequately alleged an antitrust injury, which gives them standing under section 4 of the Clayton Act to bring this private action.[9] Marriott's motion to dismiss Count XIV is **DENIED.**

## B. West Virginia Unfair Practices Act Claim

■ The plaintiffs also bring suit under a provision of the WVUPA, which states in pertinent part:

The secret payment or allowance of rebates, refunds, commissions, or unearned discounts, whether in the form of money or otherwise, or secretly extending to certain purchasers, special services, or privileges not extended to all purchasers purchasing upon like terms and conditions, to the injury of a competitor and where such payment or allowance tends to destroy competition, is an unfair trade practice . . . .

8. This second injury—the loss of business vis-a-vis competitors—sounds something like a "competitive injury." Of course, this court has concluded that competitive injury need not be plead as part of the antitrust injury requirement in a section 2(c) claim. Accordingly, the court need not, and does not, evaluate whether this second allegation would satisfy that requirement. Some courts imposing a competitive injury standing requirement in section 2(c) claims have held that similar allegations are sufficient; others have held that such allegations are insufficient. *Compare Hansel 'N Gretel Brand, Inc.*, 1997 WL 543088, at *10 (allegations that the defendant "sold its products to HNG's competitors at a lower price than it charged to HNG, or charged HNG more than HNG's competitors were paying for the same kind of merchandise," were sufficient to state antitrust injury); *with Fed. Paper Bd. Co.*, 693 F.Supp. at 1388 (even though complaint alleged that the plaintiff had paid above-market rates for wastepaper because its purchasing agent had taken bribes from certain suppliers, "without allegations of additional facts that demonstrate how [other] suppliers were precluded from taking competitive actions in order to secure sales with Federal, the amended complaint does not sufficiently allege anticompetitive effect").

9. Marriott also argues that the plaintiffs fail to adequately allege antitrust injury because they do not allege facts sufficient to define the relevant market in which competition was impaired. Because the court has concluded that an injury flowing from a reduction in competition need not be alleged to satisfy the antitrust injury requirement in the context of section 2(c), the plaintiffs of course need not define the relevant market in which competition has been reduced.

W. Va.Code § 47–11A–3 (West 2002).[10] Marriott argues that under this statute, proof to injury of a competitor of the party granting the rebate or paying the commission is a necessary element. Thus, Marriott argues, the plaintiffs must prove that competitors of the vendors who allegedly paid the sponsorship fees were injured. For example, a towel vendor might allege that it lost sales that it could have made to In Town Hotels because one of its competitors paid a secret fee to Marriott in exchange for the exclusive opportunity to sell towels (presumably at above-market prices) to the Hotel. In this type of scenario, Marriott argues, the towel vendor might fit the terms of the statute. The towel vendor would have alleged "injury of a competitor" to the party making a "secret payment," and also that "such payment … tends to destroy competition," insofar as the payment by the competitor destroyed the competitive process of bidding for towel sales to the Hotel.

The plaintiffs respond that in this case, they are a competitor of the defendant Marriott and thus they fit within the plain terms of the statute. The plaintiffs allege that Marriott owns or operates other hotels in the same market and thus competes with In Town Hotels directly. By accepting the sponsorship payments, the plaintiffs allege, Marriott caused injury to In Town Hotels, one of its competitors in the hotel market. Thus, the plaintiffs claim, they have alleged "injury of a competitor" of the party receiving the payments, here Marriott.

There are no West Virginia decisions interpreting this statute, but similar or identical Unfair Practice Acts exist in other jurisdictions. The court will therefore refer to caselaw in these jurisdictions for assistance in interpreting West Virginia's UPA. Courts interpreting UPAs have generally held that a payment or rebate "to the injury of a competitor" includes injuries to the competitors of the party receiving the payment or rebate as well as the competitors of the party providing the payment or rebate. *See, e.g., ABC Int'l Traders, Inc. v. Matsushita Elec. Corp. of Am.,* 14 Cal.4th 1247, 61 Cal.Rptr.2d 112, 931 P.2d 290, 292 (1997) ("[W]e conclude that a cause of action may be pled by alleging competitive injury among buyers" as well as among sellers); *Diesel Elec. Sales & Serv. v. Marco Marine San Diego, Inc.,* 16 Cal.App.4th 202, 214–15, 20 Cal.Rptr.2d 62 (1993) ("[B]oth sellers and buyers should generally be held liable in the event of such discounts.").[11] Here, the parties pro-

---

**10.** Section 47–11A–3 is actually a criminal statute that makes this conduct a misdemeanor. The plaintiffs may pursue a private cause of action based on this statute because West Virginia law creates a private right of action for unfair trade practices. *See* W. Va.Code § 47–11A–9.

**11.** Marriott cites *Marco Marine* for the contrary proposition that UPAs only cover injury to a competitor of the party granting the rebate, not the party receiving the rebate. But *Marco Marine* holds to the contrary. The court specifically rejected the defendant's contention that the Act "does not apply to buyers who receive secret allowances of unearned discounts, but only to the sellers who provide them." *Id.* at 214, 20 Cal.Rptr.2d 62.

Instead, the court held that "both sellers and buyers should generally be held liable in the event of such discounts." *Id.* at 214–15, 20 Cal.Rptr.2d 62. Marriott also cites *Burge v. Pulaski County Special Sch. Dist.,* 272 Ark. 67, 612 S.W.2d 108 (1981), for support of its position. It is true that the *Burge* court held that "the Act provides a remedy only in favor of one seller against another seller, not in favor of a seller against a buyer or vice versa." *Id.* at 110. But this does not mean that the Act covers sellers but not buyers, only that sellers are only covered vis-a-vis other sellers. (The court does not address whether buyers are covered vis-a-vis other buyers.) Moreover, the *Burge* court did not provide much explanation for its limitation of the right to recovery under the Acts, and it also justified

viding the payment or rebate are the vendors. Their competitors—in the example above, other towel vendors—are one group covered by the phrase "injury to a competitor." The party receiving the payment or rebate here is Marriott. Marriott's competitors—including In Town Hotels—are also a group covered by the phrase "injury to a competitor."

It is true that the factual scenario presented by the plaintiffs' allegations is atypical for a claim under Unfair Practices Acts such as West Virginia's. UPAs typically protect competitors of the seller from injury due to secret rebates given to buyers by that seller, or protect competitors of a buyer from injury due to secret rebates given that buyer by a seller. Courts have characterized Unfair Practices Acts as "prohibit[ing] sellers from giving secret discounts to certain purchasers when the discount 'injures a competitor and tends to destroy competition.'" *Am. Booksellers Ass'n v. Barnes & Noble, Inc.*, 135 F.Supp.2d 1031, 1043 (N.D.Cal.2001) (quoting *ABC Int'l Traders, Inc.*, 61 Cal.Rptr.2d 112, 931 P.2d at 294). For example, the California Court of Appeals held that a distributor of hydraulic fittings and hoses stated a claim for injury under California's UPA by alleging that a competitor-distributor received secret rebates from the manufacturer. *Diesel Elec. Sales & Service, Inc.*, 16 Cal.App.4th at 212–14, 20 Cal. Rptr.2d 62. The distributor alleged that it went out of business in part because its competitor was routinely given volume discounts by the manufacturer even though the competitor did not purchase enough hoses to qualify for the discount under the manufacturer's standard terms of sale. *Id.*

■ This case is different, as it involves allegations of a secret *premium*, not a secret *rebate*. In Town Hotels does not allege, of course, that it received a secret rebate (nobody complains about unknowingly saving money), nor does it allege that its competitors received a secret rebate in their purchase of goods. Rather, In Town Hotels in essence alleges that it incurred a secret premium on the goods it purchased. Specifically, In Town Hotels alleges that "it is restricted in its choice of and access to independent vendors and consequently has paid prices for goods, wares and merchandise that were higher than it would have paid in the absence of Defendants' kickback scheme." (Compl.¶ 176.) The idea here is that Marriott paid a premium for the goods it purchased from vendors on behalf of In Town Hotels, and that this premium was the benefit received by the vendors in exchange for their payments or rebates to Marriott. In other words, In Town Hotels paid above-market rates for goods, and Marriott and the vendors profited by splitting the difference.

Of course, the fact that this case is not like most UPA cases does not mean that the plaintiffs have failed to state a claim—they may have struck upon a novel application of the law. The question is whether their claim meets the terms of the statutory language. The statute prohibits "[t]he secret payment or allowance of rebates, refunds, commissions, or unearned discounts ... to the injury of a competitor and where such payment or allowance tends to destroy competition." W. Va. Code § 47–11A–3. Here, the plaintiffs do allege a secret payment and allowance of commissions and rebates, namely payments and rebates paid to Marriott by

dismissing the case on the alternative ground that the payments were not secret. *Id.* To the extent that *Burge* does stand for the plaintiffs' proposition that the Acts cover only injuries to competitors of the party granting the rebate, not the party receiving the rebate, this court declines to follow *Burge*.

vendors. The question is whether this commission was "to the injury of a competitor" and whether the commission "tend[ed] to destroy competition." *Id.*

As explained above, the plaintiffs allege that they are in competition with Marriott, because Marriott owns, operates, or franchises other hotels. (Compl.¶ 178.) The plaintiffs further allege that as a result of the secret payments received by Marriott, In Town Hotels paid a higher price for goods than did its competitor hotels, some of which are owned or operated by Marriott. Accepting these allegations as true, the court agrees with the plaintiffs that the secret commissions operated "to the injury of a competitor" (In Town Hotels) of the party receiving the payment (Marriott). Furthermore, the commissions tended to destroy competition. The alleged secret commissions removed In Town Hotels' purchase of goods from the competitive process and thereby eliminated competition in the provision of goods to the Hotel. Accepting the allegations as true, In Town Hotels' purchase of goods was not based on the best price for the goods in question, but rather on which vendor was willing to pay Marriott the sponsorship fee.

In fact, the court has discovered one case holding (albeit indirectly) that a UPA covers the type of conduct alleged here. The case involved a prosecution for making a false statement on a tax return. *United States v. Di Girolamo*, 808 F.Supp. 1445 (N.D.Cal.1992). The defendant, the owner of a painting business, had taken business deductions for bribe payments to an employee of First Nationwide Savings to secure the award of painting contracts from First Nationwide. *Id.* at 1447. To prove its case, the government had to establish, among other things, that the payments were illegal under state or federal law. *Id.* at 1448. The government argued that the California UPA "proscribes cer-

tain forms of bribery and bid-rigging." *Id.* at 1451. The court agreed, holding that the alleged bribe payment "falls within the scope of the Unfair Practices Act" and "destroyed all competition in the letting of painting contracts for First Nationwide Savings." *Id.* at 1452.

In sum, the court concludes that the plaintiffs have adequately alleged a violation of W. Va.Code § 47–11A–3. Marriott's motion to dismiss this count is therefore **DENIED**.

### III. Avendra's Motion to Dismiss

The other defendant, Avendra, filed a motion to dismiss all of the counts against it. For the reasons discussed below, the court concludes that Avendra is only entitled to dismissal of Count VI (fraud).

#### A. Dismissal based on the terms of the Contract

■ Avendra first argues that all claims must be dismissed because the contract between In Town Hotels and Marriott specifically permits Marriott to (1) purchase inventories and supplies from itself or from Marriott affiliates such as Avendra, and (2) make a reasonable profit on such transactions. Accordingly, Avendra argues, the profits obtained by Marriott and Avendra from purchasing hotel supplies are specifically permitted by the contract. According to Avendra, Marriott's and Avendra's receipt of these profits cannot possibly constitute a breach of contract, breach of fiduciary duty, commercial bribery in violation of the Robinson–Patman Act, or any of the other claims alleged. Avendra bases this argument on language from section 1.02 of the Management Agreement between Marriott and In Town Hotels. That section provides, under the heading "Delegation of Authority," that Marriott "shall have discretion and control . . . in all matters relating to the manage-

ment and operation of the Hotel, including ... procurement of inventories, supplies and services (purchases from [Marriott] and its affiliates shall be at competitive prices) ...." (Compl. App. A, at 2.) This provision, Avendra argues, clearly contemplates that Marriott and its affiliates, such as Avendra, may profit from purchasing hotel supplies.

The plaintiffs respond by pointing to other sections of the Management Agreement that, they contend, prohibit Marriott from retaining profits related to their management of the Hotel except as provided in the management fee provision of the Agreement. Specifically, section 5.01.A of the Agreement provides that Marriott "will retain, as a management fee for services performed hereunder, an amount ... equal to twenty percent (20%) of Operating Profit." (Compl. App. A, at 13.) Later, in section 5.01.D, the Agreement provides that "[n]o charges or fees are to be paid by [In Town Hotels] to [Marriott] except as provided in the Agreement...." (Compl. App. A, at 15.)

Considering only the face of the Agreement, the court cannot conclusively determine whether the Agreement expressly permits the payments alleged to be wrongful in this case. There is some force to Avendra's argument that the phrase "purchases from [Marriott] and its affiliates shall be at competitive prices" contemplates that Marriott and its affiliates are permitted to profit from sales of supplies to the Hotel. The language of section 5.01.D of the Agreement, however, appears to restrict Marriott's compensation to the management fee set out in the Agreement. This suggests that Marriott's and Avendra's receipt of these payments and rebates may not be permitted. Without some factual development in the case regarding specific details of the relationship between Marriott and In Town Hotels, the context and nature of the alleged rebates and payments received by Marriott and Avendra, the course of dealing of the parties, and the standard practice in the industry, the court cannot resolve the tension between these two parts of the Agreement. The contract does not unambiguously authorize the allegedly wrongful rebates and payments to Marriott and Avendra. At this stage of the proceedings, Avendra is not entitled to dismissal of the counts against it based on the language of the contract.[12]

## B. Pleading Fraud with Particularity

 Second, Avendra argues that the claims for fraud, violations of the WVUPA, and aiding and abetting a breach of fiduciary duty must be dismissed because (1) all of these are fraud-based claims and (2) the plaintiffs have not plead fraud with particularity as required by Rule 9(b).[13] The court will first dispose of

---

12. In addition to this general argument that the contract explicitly permits the alleged wrongful conduct, Avendra presents several arguments that depend necessarily on the court accepting this conclusion. For example, Avendra argues that the claim for aiding and abetting a breach of fiduciary duty must be dismissed because there can be no breach of fiduciary duty in the first place when the contract explicitly permits the conduct alleged. As the court has rejected the premise upon which all of these arguments rely, they are likewise without merit and do not warrant further discussion.

13. In its memorandum in support of its motion to dismiss, Avendra initially states that the plaintiffs must comply with Rule 9(b) in their claims for "fraud, violations of the West Virginia Unfair Practices Act, and breaches of fiduciary duties ...." (Avendra Memo. at 4.) At the conclusion of this argument, however, Avendra states that "[b]ecause all of the claims against Avendra allege intentional, fraudulent conduct, Plaintiff's failure to satis-

Avendra's argument related to the WVU-PA and aiding and abetting a breach of fiduciary duty. To state a claim under the WVUPA, the plaintiffs need only allege facts indicating "the secret payment or allowance of rebates . . . to the injury of a competitor and where such payment or allowance tends to destroy competition." W. Va.Code § 47–11A–3. There is no element of fraud in this provision—the plaintiff need not allege or prove a misrepresentation, reliance, or any of the other elements of common law fraud. Because the plaintiffs' WVUPA claim is not fraud-based, the plaintiffs need not plead that claim with particularity. Avendra also assumes, without supporting argument, that the plaintiffs' claim for aiding and abetting a breach of fiduciary duty claim is fraud-based. It may be the case that certain breach of fiduciary duty claims are fraud-based and that those claims must be plead in compliance with Rule 9(b). *See Shapiro v. Miami Oil Producers, Inc.,* 84 F.R.D. 234, 236 (D.Mass.1979) ("[Rule 9(b) ] extends to averments of fraud or mistake, whatever may be the theory of legal duty—statutory, tort, contractual, or fiduciary."). But the main thrust of the plaintiffs' allegations here is that Marriott had a duty, as an agent of In Town Hotels, not to secretly profit on the side from the performance of its duties on behalf of In Town Hotels. This theory of breach of fiduciary duty does not depend on misrepresentations relied on by In Town Hotels, but simply on the receipt of illicit payments. This type of breach of fiduciary duty claim is not fraud-based and therefore need not meet the mandates of Rule 9(b).

The only claim that Avendra has identified which *is* clearly subject to Rule 9(b) requirements is the claim for fraud itself. Avendra is entitled to dismissal of this claim, as the plaintiffs have failed to plead this claim with particularity as against Avendra. Under Rule 9(b), "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." The Fourth Circuit has explained that "the 'circumstances' required to be pled with particularity under Rule 9(b) are 'the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby.'" *Harrison v. Westinghouse Savannah River Co.,* 176 F.3d 776, 784 (4th Cir.1999) (quoting 5 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure: Civil* § 1297, at 590 (2d ed.1990)). Even so, the court cautioned that "[a] court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts." *Id.*

In its count for fraud, the plaintiffs allege that the defendants, including Avendra, made false and misleading material statements and omissions, knowing that the statements were untrue, misleading, or lacking in material facts. Additionally, the plaintiffs allege that the defendants committed fraud by obtaining and retaining undisclosed kickbacks though their purchasing activities. The fraud

---

fy Rule 9(b) mandates reversal." *Id.* at 6. It is thus unclear which counts Avendra believes must satisfy Rule 9(b). To the extent that Avendra implies that all of the claims must do so, it is incorrect. For example, a claim for commercial bribery under section 2(c) of the

Robinson–Patman contains no fraud element and therefore need not be plead with particularity. The court will limit its discussion of Rule 9(b) to the three counts specifically identified by Avendra: fraud, WVUPA violations, and breach of fiduciary duty.

claim can thus be grouped into three main categories: (1) fraud by way of affirmative misrepresentation; (2) fraud by way of omission of material facts; and (3) fraud by way of obtaining and retaining undisclosed payments related to purchasing activities. The court will address these three categories in turn.

As to affirmative misrepresentations, Avendra argues that the plaintiffs have failed to allege any such misrepresentation with particularity, as required by Rule 9(b). Avendra correctly points out that while the complaint alleges generally that the defendants made false representations, the complaint does not specifically identify a single false representation made by Avendra to In Town Hotels. The complaint alleges, for example, that "[d]efendants have committed fraud ... by giving false information ... regarding related party transactions." (Compl.¶ 119.) But the plaintiffs do not provide any specific examples of such information provided by Avendra to In Town Hotels. This would leave Avendra without knowledge of what information, if any, that it provided to In Town Hotels the plaintiffs believe to be false. The other allegations of affirmative misrepresentations fare no better. These allegations of affirmative misrepresentations by Avendra to In Town Hotels lack the specificity necessary to provide Avendra with "the particular circumstances for which [it] will have to prepare a defense at trial," *Harrison*, 176 F.3d at 784, and are stated with insufficient particularity to meet the requirements of Rule 9(b).

 As for the allegations of material omissions, the plaintiffs correctly point out that when the allegation of fraud re-

lates to an omission rather than an affirmative misrepresentation, less particularity is required. *See, e.g., Shaw v. Brown & Williamson Tobacco Corp.*, 973 F.Supp. 539, 552 (D.Md.1997). As to the allegations of omission, however, the plaintiffs' claim depends necessarily on the existence of some legal duty on the part of Avendra to In Town Hotels to share the undisclosed information. In their complaint, the plaintiffs allege that "[p]ursuant to section 11.03 [of the Management Agreement] ... Marriot *and its affiliates and/or related parties* agreed that they would not profit from the provision of Chain Services." (Compl.¶ 56) (emphasis added). To the extent that this allegation suggests that Avendra (or any other Marriott affiliates) agreed in the Management Agreement not to profit from the provision of Chain Services, that allegation is flatly contradicted by the terms of the Management Agreement itself.[14] Looking at the Management Agreement, it is clear that the agreement is between only In Town Hotels and Marriott. Avendra was not a party to and is not bound by that Agreement. The plaintiffs cannot claim that Avendra owes In Town Hotels any contractual duties as a result.[15]

 Finally, the plaintiffs allege fraud based on Avendra's obtaining and retaining undisclosed payments related to purchasing activities. The court is unsure how this allegation fits in any way within the elements of common law fraud, which, generally speaking, are: " '(1) that the act claimed to be fraudulent was the act of the defendant or induced by him; (2) that it was material and false; that plaintiff relied

14. When, as here, the plaintiff relies on a contract in its complaint, and indeed includes a copy of that contract as an attachment to the complaint, "it [is] proper for the district court to consider it in ruling on [a] motion to

dismiss." *Darcangelo v. Verizon Comms., Inc.*, 292 F.3d 181, 195 (4th Cir.2002).

15. Indeed, Avendra was not created until years after the Agreement was signed.

upon it and was justified under the circumstances in relying upon it; and (3) that he was damaged because he relied upon it.'" *Legg v. Johnson, Simmerman & Broughton, L.C.,* 576 S.E.2d 532, (W.Va.2002) (quoting *Horton v. Tyree,* 104 W.Va. 238, 139 S.E. 737, 738 (1927)). Avendra's receipt of payments itself does not constitute fraud, as no representation (false or otherwise) is involved.

In sum, the plaintiffs have failed to plead fraud with particularity as required by Rule 9(b), warranting the dismissal of Count VI (fraud). The plaintiffs' other claims are not necessarily fraud-based and thus need not be plead with particularity. Finally, the contract does not unambiguously authorize the conduct alleged here. Accordingly, Avendra is not entitled to dismissal of any of the remaining claims at this time.

**IV. Conclusion**

For the foregoing reasons, the court concludes that the plaintiffs have adequately alleged antitrust injury for their claim under section 2(c) of the Robinson–Patman Act and have adequately alleged the elements of a violation of the West Virginia Unfair Practices Act. In addition, Avendra's arguments for dismissal of the claims against it are without merit, with the exception that the plaintiffs' fraud claim against Avendra is not plead with particularity as required by Rule 9(b). Accordingly, the court **DENIES** Marriott's motion to dismiss Counts IV and XIV, **GRANTS** Avendra's motion to dismiss as to Count VI (fraud) and **DENIES** that motion as to all other counts.

The court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party, and **DI-**

**RECTS** the Clerk to post this published opinion at *http://www.wvsd.uscourts.gov.*